274 So.2d 402 (1972)
STATE of Louisiana and Gulf Oil Company
v.
PLACID OIL COMPANY et al., Texaco, Inc., Intervenor.
No. 8878.
Court of Appeal of Louisiana, First Circuit.
December 26, 1972.
Rehearing Denied January 31, 1973.
Writs Granted April 5, 1973.
*404 Wm. Guste, Atty. Gen., John L. Madden, Asst. Atty. Gen., Baton Rouge, for appellant State of Louisiana.
Charles C. Gremillion, Liskow & Lewis, Melvin Evans, New Orleans, Charles B.
*405 Jarrett, New Orleans, for appellant Gulf Oil Corporation.
W. Scott Wilkinson, Wilkinson, Woods, Carmody & Peatross, Shreveport, Armand A. Gutuierrez, Dallas, Tex., for appellee Placid Oil Co.
John C. Christian, Eugene D. Saunders, Milling, Saal, Saunders, Benson & Woodward, New Orleans, for appellee J. Ray McDermott & Co.
John Pat Little, Guste, Barnett & Little, New Orleans, for appellee Frederic Allen Roussel.
C. Ellis Henican, Henican, James & Cleveland, New Orleans, for appellees C. Ellis Henican, Philip E. James, Murray F. Cleveland, Gerald M. Charpentier, Jr., Stephen B. Charpentier, Esther Charpentier McCauley, Joseph Earl Charpentier, Jr., May Charpentier Stark, Louise Charpentier Seiler, Mildred Charpentier Hosley, Joan Charpentier Czmyrid, Evelyn Meynier Romaguerea, Joseph C. Meynier, Ruth Meynier Ballatin, Clementine Meynier Dixey, Albert Meynier, Bertha Meynier Moinet, Lois Meynier Henderson, Ramona Meynier Cames, Anna Meynier Dickinson.
Margot Mazeau, Normann & Normann, New Orleans, for appellees Frank S. Normann, Daisy Torian Nelson, John Nelson.
John E. Coleman, Jr., Jack C. Caldwell, Aycock, Horne, Caldwell & Coleman, Franklin, for appellees Mrs. Frances Lyons Todd, Testamentary Executrix of the Succession of Spencer G. Todd, Sr., deceased; Mrs. Florence R. Cotten, Mrs. Katherine R. Moss, Miss Emma E. Roussell, Mrs. Marguerite R. Hereford, Mrs. Kathryn R. Duputy, Mrs. Margaret R. Matthews, Philip A. Roussel, Mrs. Florence R. Raymond, George A. Roussel.
Jacob S. Landry, Jack J. Cousin, Landry, Watkins, Cousin & Bonin, New Iberia, for appellees National Trust for Historic Preservation in the United States, Margaret Ann Shinn, W. K. Smith.
William D. Hunter, Lippman, Hunter & Rawls, Morgan City, for appellee Mrs. Joan Rochel Landry, Wife of Alphonse D. Landry, Jr.
James H. Roussel, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, for appellees Elise Roussel, Sedley H. Roussel Alpaugh, Marie H. Roussel, William D. Roussel, Jr., James H. Roussel, Susie Rochel Eggleston, Edvige Rochel, Angela Devlin, Shirley Devlin Bridges, Daniel J. Devlin, III, Michael Coles Devlin, Angela Jane Devlin, William J. Devlin, Jr., Elizabeth Devlin Chipley, Philip A. Devlin, Thomas J. Devlin, John J. Devlin, Jr., Amelie Cornay, Mrs. John Church, Florian A. Cornay, J. N. Wenger, Mrs. William C. Dawson.
Bernard E. Boudreaux, Jr., Bauer, Darnall, McNulty & Boudreaux, Franklin, for appellees Joan Charpentier Czymyrid, Mrs. Marguerite Prescott Youngman, Anna Rochel Youngblood, Ernest L. Sansum, Rochelle Prescott, Anne Roussel Cunningham, Mrs. Eleanor P. Smith, Mrs. C. C. McCutchon.
Frances Bernadette Rochel Delaune, in pro. per.
Charles F. Bailey, Bailey & Mouton, Lafayette, Wiley G. Lastrapes, New Orleans, William J. Conrad, New Orleans, for appellee Texaco, Inc., intervener.
Mrs. Betty Dodson Blanchard, Philip Harold Prescott, Mrs. Katherine Frances Dupuy, Shirley Devlin Bridges, James H. Roussel, Sedley H. Roussel Alpaugh, Marie H. Roussel, William D. Roussel, Jr. (Heirs of Louis B. Roussel), c/o James H. Roussel, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, in pro. per., interveners.
Before LANDRY, SARTAIN, ELLIS, BLANCHE and TUCKER, JJ.
Rehearing En Banc Denied January 31, 1973.
BLANCHE, Judge.
The State and its mineral lessee, Gulf Oil Corporation (State-Gulf), appeal from *406 judgment rejecting the State's petitory action to be declared owner of three parcels of land lying below the ordinary high water mark of Six Mile Lake adjacent to Sections 49, 50 and 68, Township 15 South, Range 11 East, St. Mary Parish, and also for an accounting of the proceeds of three oil wells drilled thereon by defendant, Placid Oil Company (Placid), designated as S. G. Todd Wells, 3, 4 and 5. The trial court based its decision upon finding that Six Mile Lake is a stream, the bed of which is owned by the State only to the ordinary low water mark (Louisiana Civil Code Article 455), and to which Louisiana Civil Code Article 509 applies, thereby making the alluvion involved the property of the riparian landowners.
In addition to Placid, J. Ray McDermott & Company, Inc. (McDermott), assignee of Placid, was also made defendant. Pursuant to exceptions of non-joinder of indispensable parties filed by Placid and McDermott, numerous alleged owners (from whom Placid acquired mineral leases) were also made defendants by various supplemental and amending petitions filed by State-Gulf. Texaco, Inc. (Texaco), which owns an undivided one-half of Section 68, and certain parties claiming interests in Section 68 adversely to Texaco, intervened asserting interests in opposition to State-Gulf. The conflicts between Texaco and its adversaries regarding Section 68 have been compromised. All said parties have united in resisting the claims of State-Gulf. Some disputes exist among defendants regarding their ownership of subject sections. It was agreed by stipulation that all such controversies be relegated to future resolution among the parties concerned, should defendants as a class defeat the State's claim of ownership.
Sections 49, 50 and 68 all about the south shore of Six Mile Lake. It is conceded that the traverse line of these sections, as shown on the official plat of Township 15 South, Range 11 East, Louisiana Meridian, approved by the State Surveyor General May 19, 1842, constitutes the northern boundary of these sections. It is also acknowledged that the traverse line thus established is predicated upon a survey by A. L. Fields, in 1837, whose plat and field notes are of record in the archives of the Register of the State Land Office, a copy thereof being of record herein. Further conceded is the fact that Grand Lake-Six Mile Lake was a navigable body of water upon the State's admission to the Union in 1812.
The record establishes that when separated from the Federal Government by patents dated June 1, 1848, August 21, 1845, and January 1, 1849, Sections 49, 50 and 68 contained 172.87 acres, 447.58 acres, and 86.63 acres, respectively. It is conceded that upon trial of this matter in 1967, a vast amount of acreage had been added to Sections 49 and 50 in the form of alluvion that had built out northerly from the traverse line of those sections. As regards Section 68, it is conceded that the area in dispute, lying north of its traverse lines, is approximately three times the size of that section lying south of its traverse line.
State-Gulf contends the State acquired title to the beds of all navigable waters in the state, whether lakes, rivers or streams, up to the ordinary high water mark, upon the State's admission to the Union in 1812. Defendants conceded the State's acquisition to the ordinary high water mark in the case of lakes. In the case of rivers and streams, defendants maintain the State acquired title to beds and bottoms only to the ordinary low water mark, and that the banks of rivers and streams, that is, the area lying between ordinary high water and ordinary low water marks, belongs to the riparian owners, together with all alluvial additions thereto.
Defendants assert title through the patentees of the respective sections. Placid and McDermott hold mineral leases from the patentees' successors in title and rely upon the validity of their lessors' titles. Alternatively, Placid asserts that if the State be declared owner of the property in *407 dispute, Placid holds a valid lease thereon from the State dated February 24, 1960, bearing Lease Number 3643, covering Tract Number 7722. In this regard, Placid contends that the State's lease to Gulf, Number 2963, dated April 18, 1956, covering Tract Number 6453, does not include the property in controversy. Texaco is not concerned with this issue.
In proof of its case in chief, State-Gulf produced the official Township Plat of Section 15 South, Range 11 East, and Fields' supporting field notes. State-Gulf also produced the lease between themselves and the leases from defendants to Placid together with Placid's assignment to McDermott. In addition. State-Gulf offered testimony showing that the allegedly offensive wells are located north of the traverse line of Sections 49, 50 and 68. State-Gulf also offered a stipulation showing the value of oil produced by Placid from subject tracts. By voluntary motion, State-Gulf dismissed its action against McDermott insofar as concerns their demand for an accounting of oil produced. It was further stipulated that Placid alone would be responsible for the value of minerals produced in the event State-Gulf prevailed herein.
After producing the foregoing proof in chief, State-Gulf rested its case contending that it thus made out a prima facie showing of its title and defendants' trespass, thereby shifting the burden to defendants to prove title from the State. In substance, State-Gulf argued that if defendants owned the disputed lands, they acquired title thereto from the State pursuant to state law which vests title to the banks of navigable rivers and streams and all alluvion which attaches thereto in the riparian owners. Therefore, State-Gulf contends it was incumbent upon defendants to defeat the State's title by showing that the areas in question were the banks of a river or stream or alluvion thereto attached. Alternatively, State-Gulf contended that if the State did not have title to the areas in dispute, the State's lease Number 2963 to Gulf, dated April 16, 1956, is nevertheless valid pursuant to Act 341 of 1952, LSA-R.S. 9:1151, which provides that where a change in ownership occurs as a result of the action of a navigable lake, stream or bay, the new owner of such lands or water bottoms, including the State, takes the same subject to all oil, gas and mineral leases affecting such lands or water bottoms, and also subject to the rights of the mineral owners, their heirs, successors and assigns.[1]
Upon State-Gulf resting their case, Placid, McDermott and certain other defendants filed exceptions of no cause and no right of action, based primarily on the contention the State failed to prove its title to the disputed areas, which a plaintiff is required to do in a petitory action. Exceptors so urged below, and reurge here, that the failure of the State to prove whether Six Mile was a lake, at the time of the State's admission to the Union in 1812, is fatal to the State's claim of ownership. It is exceptors' position that the State did not acquire title to subject property unless Six Mile Lake was a lake at the moment of statehood. Exceptors also contend that if Six Mile Lake was a river or stream in *408 1812, title to the banks thereof (that is the area between ordinary high water and ordinary low water) remained in the then owner, the Federal Government, and was transmitted to defendants through defendants' ancestors in title, the original patentees from the Federal Government in the 1840's. Defendants argue that if Six Mile Lake is a river or stream, it was incumbent upon the State to establish in chief that the property in question lies below the ordinary low water mark of that water body because the State owns the beds and bottoms of rivers and streams only to the ordinary low water mark. Failure of the State to establish the low water mark of Six Mile Lake left unproved an indispensable element of the State's claim. For reasons hereinafter set forth, we find no error in the judgment of the trial court overruling defendants' exceptions of no cause and no right of action.
Upon overruling of defendants' exceptions of no right and no cause of action, defendants, under protest, proceeded to establish their claims of ownership. Following presentation of defendants' case, State-Gulf rebutted. Near the end of the lengthy trial, defendants filed exceptions of res judicata, stare decisis and estoppel based primarily upon the ruling of this court in State v. Cockrell, 162 So.2d 361 (La.App. 1st Cir. 1964), certiorari denied, 246 La. 343, 164 So.2d 350.
The trial judge rendered judgment overruling defendants' exceptions of res judicata, stare decisis and judicial estoppel. On the merits the trial judge rendered judgment against State-Gulf dismissing their demands; decreeing that the land area comprised of that bounded on the south by the traverse line abutting Sections 49, 50 and 68, Township 15 South, Range 11 East, St. Mary Parish, and north to the ordinary low water mark of Six Mile Lake to be the property of the riparian landowners of these three sections; decreeing the ordinary low water mark of Six Mile Lake as of July 8, 1963, the date of the filing of this suit, to be a line having an elevation of plus 0.11 feet above mean sea level, subject to such changes, if any, in said line as may subsequently result from accretion, reliction, or dereliction; ordering State lease Number 2963, dated April 18, 1956, to Gulf Refining Company, and State lease Number 3643, dated February 24, 1960, to Placid Oil Company, cancelled and annulled insofar as said leases purport to cover and affect any of the property as described in the judgment and the subject of this suit; and taxing as costs against State-Gulf, in solido, expert witness fees for Placid Oil Company in the sum of $31,733.29, and in favor of Texaco, Inc., the sum of $31,345.94. The judgment of the trial court contained other decrees not pertinent to this appeal.
No mention was made by the trial judge either in the judgment or in his Written Reasons for Judgment of Act 341 of 1952, LSA-R.S. 9:1151. In their appeal State-Gulf contended the trial court erred in:
(1) Holding the State acquired ownership of the beds and bottoms of navigable rivers and streams only to the ordinary low water mark;
(2) Finding Six Mile Lake is a stream within the meaning of the term as used in LSA-C.C. art. 509, and was a lake in 1812;
(3) Concluding subject areas are alluvion which formed in the bed of Six Mile Lake subsequent to 1812, and is now owned by defendants, except Placid and McDermott, and are not encompassed in State's Lease 2963 held by Gulf;
(4) Decreeing that part of the land which formed the banks of the steam in 1812 (the area between ordinary low water and ordinary high water) belonged to the owners of the adjoining lands;
(5) Recognizing defendants, except Placid and McDermott, to be owners of those lands lying between the ordinary low water mark and ordinary *409 high water mark of Six Mile Lake, and ordering cancellation of State Lease 2963 to Gulf covering said lands, notwithstanding the provisions of Act 341 of 1952, LSA-R.S. 9:1151;
(6) Adopting the method of determining ordinary low water in Six Mile Lake, known as the "seasonal low," employed by defendants' witness, Philip C. Whitaker;
(7) Taxing State-Gulf for expert witnesses' fees incurred by Placid and Texaco in exorbitant, unjustified amounts which included payment for time spent by experts in assisting Placid and Texaco in the preparation of their cases, contrary to law and in abuse of the trial court's discretion in such matters;
(8) Taxing costs against State-Gulf in solido. In this regard, State claims it is liable only for stenographer's fees and Gulf maintains it is only a nominal party and should not be cast at all.

PEREMPTORY EXCEPTIONS URGING NO CAUSE AND NO RIGHT OF ACTION
State-Gulf urges that defendants' failure to appeal or answer appellants' appeals procedurally bars consideration on this appeal of defendants' exception urging no cause and no right of action based on the alleged failure of State-Gulf to establish the State's title to the ordinary high water mark of Grand Lake-Six Mile Lake, which exception was overruled by the trial court. In so contending, State-Gulf relies upon Alfonso v. Alfonso, 160 So.2d 294 (La.App. 1st Cir. 1964), and Food Town, Incorporated v. Town of Plaquemine, 174 So.2d 833 (La.App. 1st Cir. 1965).
An appeal may be taken only from a final judgment or an interlocutory judgment which causes irreparable injury. LSA-C. C.P. art. 2083. A final judgment determines the merits in whole or in part; an interlocutory judgment is one which does not determine the merits but only decides preliminary matters in the course of the action. LSA-C.C.P. art. 1841.
LSA-C.C.P. art. 2133 provides that an appellee is not required to answer an appeal unless he desires to have the judgment modified, revised or reversed in part or unless he demands damages against the appellant.
A judgment overruling an exception of no right of action does not decide the merits in whole or in part; therefore, it is not a final judgment but an interlocutory decree. Such a judgment does not cause irreparable injury, consequently, it is a nonappealable judgment. LSA-C.C.P. arts. 1841, 2083. Defendants could not have appealed the judgment dismissing their exception of no right of action.
Our present LSA-C.C.P. art. 2133 is patterned upon Articles 591, 592, 886 through 889 and 890 and 891 of our former Code of Practice of 1870. The Redactor's Comment to Article 2133, above, however, notes that no change was intended to be made in the prior law as established by the abovementioned articles and the jurisprudence interpreting same.
Prior to Succession of Markham, 180 La. 211, 156 So. 225 (1934), numerous cases held in effect that if an appellee wished to reurge on appeal an exception which had been overruled below, it was necessary to either appeal or answer the appeal. Markham, above, however, expressly overruled this line of jurisprudence, and held that Articles 888 and 592 of the Code of Practice did not require an appellee to appeal or answer an appeal to reurge before the appellate court exceptions which had been overruled by the trial court. The rule announced in Markham, above, was followed in Schwandt v. Nunez, 71 So.2d 583 (La.App.Orl. Cir. 1954), and numerous other cases such as Brown v. Garner, 157 So. 136 (La.App. 2nd Cir. 1934); Columbia Oil Company v. Police Jury of Natchitoches *410 Parish, 194 So. 91 (La.App. 2nd Cir. 1940); McGee v. Demery, 176 So.2d 679 (La.App. 4th Cir. 1965); and Stevenson v. Roy, 194 So.2d 424 (La.App. 4th Cir. 1967).
The ruling of this Court in Alfonso and Food Town, Incorporated, did not discuss Markham, which apparently was not brought to the Court's attention by counsel therein. In any event, it is clear that our rulings in these cases are patently at odds with the overwhelming weight of authority and cannot prevail in view of the Supreme Court's ruling in Markham, above. We conclude that the failure of defendants to appeal or to answer appellants' appeal does not procedurally bar our considering defendants' exceptions.
We further conclude, however, that the peremptory exception urging no cause and no right of action filed by defendants at the conclusion of the presentation of plaintiffs' case had to be overruled by the trial court for the simple reason that the peremptory exception cannot be used under Louisiana law as a substitute for the common law motion for a directed verdict or demurrer to the evidence.
The foregoing principle was expressly recognized and applied by the Third Circuit Court of Appeal in Joseph v. Tri Parish Flying Service, Inc., 201 So.2d 321 (La.App. 3rd Cir. 1967), the following excerpt from which opinion we reproduce herein with approval:
"It is now well established by our jurisprudence that an exception of no cause of action cannot be used to test the sufficiency of plaintiffs' evidence to prove a cause of action which he has properly pleaded. Williams, et al. v. Missouri Pacific Railroad Company, 6 So.2d 79 (La.App. 2nd Cir. 1941, certiorari denied); Bartholomew v. Impastato, 12 So.2d 700 (Orl.App.1943); Domite v. Thompson, 9 So.2d 55 (La.App. 2nd Cir. 1942); Home Insurance Company of New York v. I. R. & G. Company, et al., 43 So.2d 504 (La.App. 2nd Cir. 1949); Kennedy v. Perry Timber Company, 219 La. 264, 52 So.2d 847 (1951); Roy O. Martin Lumber Company v. St. Denis Securities Company, 225 La. 51, 72 So.2d 257 (1964); Kline v. Dawson, 230 La. 901, 89 So.2d 385, footnote 1, at page 387 (1956); Fister v. Fister, 131 So.2d 103 (La.App. 3rd Cir. 1961); Pflieger v. Haws, 180 So.2d 892 (La.App. 1st Cir. 1965).
"In Bartholomew v. Impastato, supra, with then Judge, now Justice, McCaleb, as the organ of the court, it is stated:
'Motions for judgment, directed verdicts and demurrers to evidence are procedural pleadings of the common law which are unknown in our system. See Williams v. Missouri Pac. R. Co., supra. And, they may not be invoked in Louisiana by disguising them with the label of exception of no right or cause of action. If the defendant doubts the sufficiency of the evidence submitted by plaintiff to sustain his demand and does not see fit to contradict the evidence which has been submitted, he unquestionably has the right to have the court determine the sufficiency of plaintiff's evidence by resting his case. In such instances, a judgment should be rendered on the merits in favor of one side or the otherbut not on an exception of no cause of actionfor that exception challenges the legality of the cause alleged and does not pertain to the trial on the merits.'
"It is true that most of the above cited cases were decided before the adoption of our new Code of Civil Procedure in 1960. However, the new code, like the old Code of Practice, makes no provision for a procedural device similar to the motion for directed verdict or demurrer to the evidence, used in many common law jurisdictions. It thus appears that the redactors of our new code have made a deliberate policy choice not to change the law in this regard." (Joseph *411 v. Tri Parish Flying Service, Inc., 201 So.2d at 322, 323)

THE BURDEN OF PROOF ISSUE
Defendants contend that this is a petitory action in which State-Gulf must bear the burden of proof by establishing the State's alleged title in presenting the State's case in chief. This, according to defendants, State-Gulf has not done. In so contending, defendants maintain that the State's title to the beds and bottoms of navigable waters is derivative, not original, in that it comes from the Federal Government upon the State's admission to the Union. Defendants concede that at the moment of statehood, state and federal domain with respect to all navigable water bodies, regardless of classification as streams, lakes, rivers, or otherwise, were divided or separated at the ordinary high water mark. Defendants contend, however, upon authority of Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894), Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428 (1891), and United States v. Gossett, D.C., 277 F.Supp. 11 (1967), that the extent of title which a state receives in and to the beds and bottoms of navigable waters is determined by state law. Therefore, according to defendants, what the State of Louisiana received by way of title to the beds of navigable water bodies depended upon state law in existence when Louisiana was admitted to the Union in 1812. In 1812, the Louisiana law on the subject was Article 8 of the Code of 1808, which provided:
"The use of the shores of navigable rivers or creeks is public; accordingly every one has a right freely to bring his ships to land there, to make fast the same to the trees which are there planted, to unload his vessels, to deposit his goods, to dry his nets and the like. Nevertheless the property of the river shores belong (belongs) to those who possess the adjoining lands."
The above provision was retained as Article 446 of the Code of 1825 and Article 455 of the Code of 1870 except that the word "shores" was changed to "banks." Article 448 of the Code of 1825 and Article 457 of 1870 defined banks of a river or stream to be that which contains it in its ordinary state of high water, although such areas may be overflowed for a time.
Based on the foregoing provisions, defendants contend that upon admission to the Union, the riparian owners became vested with title to the banks of rivers and streams, that is, the area between ordinary high and ordinary low water. The State, according to defendants, acquired title to high water mark only in the case of lakes. Consequently, defendants contend, it was incumbent upon the State to prove that the water body was a lake in 1812. It is defendants' position that it was insufficient for the State to prove merely that the disputed lands lay below high water, because if Six Mile Lake is a river or stream, the land belongs to defendants if it lies above ordinary low water.
In substance, defendants claim title from the Federal Government by operation of state law, which limits the effect of what the State received upon admission to statehood. We reject this interpretation. The import of the argument is that a state law which disposes of what the State acquires is, by the same token, a limitation of what the State received. We interpret the 1808 article not as a limitation of what the State received from the Federal Government, but rather an expression of sovereign intent to establish rights to what the State acquired. As between the Federal Government and the State, it is conceded that the separation is effective at the high water mark. If the Federal Government, or anyone else owns anything below the high water mark after a State's admission to the Union, such ownership stems from state law. We find this conclusion accords with the Federal jurisprudence as established in Shively v. Bowlby, above, and Hardin v. Jordan, above.
*412 In Shively, plaintiff sued defendant to quiet title to land situated in Oregon below the high water mark of the Columbia River. Plaintiff's title derived from one J. Shively who obtained title from the U. S. Congress in 1850, while Oregon was still a territory, the deed calling for lands below the high water mark. Later, plaintiff acquired the lands below the high water mark from the State of Oregon. Defendant claimed the land by conveyance from J. Shively, the dispute concerning lands not included in J. Shively's deed to plaintiff, but included in plaintiff's deed from the state. Plaintiff's claim was based on the conveyance from the state; defendant's claim depended upon the congressional grant to J. Shively. The Court determined plaintiff to be the owner on finding that the property below the high water mark was not included in the grant to J. Shively prior to Oregon's statehood. However, the Court clearly recognized the right of Congress to convey lands below navigable waters prior to statehood, but noted that such had not ever been done by general laws, but only in special cases involving some international duty or public interest. The Court also made it clear that when a state was created from a former territory, the laws of the state determined ownership of lands underlying navigable waters. In this regard, we quote the following from Shively, above:
"The new states admitted into the Union since the adoption of the constitution have the same rights as the original states in the tide waters, and in the lands under them, within their respective jurisdictions. The title and rights of riparian or littoral proprietors in the soil below high-water mark, therefore, are governed by the laws of the several states, subject to the rights granted to the United States by the constitution.
"The United States, while they hold the country as a territory, having all the powers both of national and of municipal government, may grant, for appropriate purposes, titles or rights in the soil below high-water mark of tide waters. But they have never done so by general laws, and, unless in some case of international duty or public exigency, have acted upon the policy, as most in accordance with the interest of the people and with the object for which the territories were acquired, of leaving the administration and disposition of the sovereign rights in navigable waters, and in the soil under them, to the control of the states, respectively, when organized and admitted into the Union.
"Grants by congress of portions of the public lands within a territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below highwater mark, and do not impair the title and dominion of the future state, when created, but leave the question of the use of the shores by the owners of uplands to the sovereign control of each state, subject only to the rights vested by the constitution in the United States." (Shively v. Bowlby, 152 U.S. 1, 57, 58, 14 S.Ct. 548, 569, 570)
In Hardin v. Jordan, above, the issue was whether a riparian owner's title stopped at the water's edge or went to the middle of a lake. Plaintiff claimed through a patent from the Federal Government. In considering the extent of land conveyed by the patent to plaintiff's ancestor in title, the Court noted:
"With regard to grants of the government for lands bordering on tide-water, it has been distinctly settled that they only extend to high-water mark, and that the title to the shore and lands under water in front of lands so granted inures to the state within which they are situated, if a state has been organized and established there. Such title to the shore and lands under water is regarded as incidental to the sovereignty of the state, a portion of the royalties belonging thereto and held in trust for the public purposes of navigation and fishery,and *413 cannot be retained or granted out to individuals by the United States. * * *
"This right of the states to regulate and control the shores of tide-waters, and the land under them, is the same as that which is exercised by the crown in England. * * * but it depends on the law of each state to what waters and to what extent this prerogative of the state over the lands under water shall be exercised. * * *" (Hardin v. Jordan, 140 U.S. 371, 381, 382, 11 S.Ct. 808, 811, 812)
Choctaw Nation v. Oklahoma, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), and United States v. Alaska, 9 Cir., 423 F. 2d 764 (1970), do not support defendants' claim that their patentee ancestors in title derived ownership directly from the Federal Government. Choctaw Nation involved lands underlying the Arkansas River, in areas patented to several Indian nations, in what is now Oklahoma, prior to Oklahoma's statehood. The Indians were held to have rights superior to those of a mineral lessee from the state. This decision accords with Shively, above, which fixed ownership of all territorial navigable water bodies in the United States, and represents one of the special instances wherein the United States disposed of such areas before the territory became a part of the Union.
United States v. Alaska, above, is clearly another such special instance as envisioned in Shively. Alaska involved the beds of water bodies situated in a wildlife preserve created by Congress prior to Alaska's statehood. A state-granted mineral lease on lands underlying navigable waters within the preserve was held invalid on the ground that the United States had the right and power to grant title to lands which would otherwise go to the states on admission to the Union.
In summary, we hold that upon admission to the Union, Louisiana obtained title to the beds of all navigable waters below the high water mark, and that defendants' claiming through a patent issued by the Federal Government following Louisiana's statehood, take and derive their title from the State of Louisiana. It follows that the State of Louisiana, upon showing that subject wells are located in the bed of a navigable water body, below the ordinary high water mark, made out a prima facie case of the State's ownership and defendants' trespass thereon. It thereupon devolved upon defendants to establish title from the State. State v. Aucoin, 206 La. 787, 20 So.2d 136 (1944).

EXCEPTIONS AND PLEAS URGING RES JUDICATA, JUDICIAL ESTOPPEL, AND STARE DECISIS
The trial court properly overruled defendants' exceptions and pleas urging res judicata, judicial estoppel and stare decisis. Res judicata applies only where the thing demanded is the same; the demand is founded on the same cause of action; and the demand is between the same parties opposing each other in the same quality, LSA-C.C. art. 2286. In this instance, there is no such identity of the respective litigants in this case as compared with the case of State v. Cockrell, cited supra, since defendants herein were not parties in Cockrell, nor is the demand the same or brought against the same parties in the same capacity. Cockrell involved title to lands adjoining Sections 45 and 46 in the same township and range as subject properties, whereas this litigation involves lands adjacent to or abutting Sections 49, 50 and 68.
The plea of judicial estoppel is likewise not well founded, inasmuch as this doctrine, to the extent that it has applicability in Louisiana law, contemplates the identity of parties in subsequent litigation compared with prior litigation, and an attempt by the party against whom the doctrine is urged to rescind or change an admission made in the prior litigation. No such attempted alteration or inconsistent *414 allegations or admissions on the part of State-Gulf have occurred herein.
Defendants' plea of stare decisis is likewise unfounded, inasmuch as in Louisiana courts are not bound by the doctrine of state decisis, but there is recognized instead in Louisiana the doctrine of jurisprudence constante, Johnson v. St. Paul Mercury Insurance Company, 256 La. 289, 236 So.2d 216, 218 (1970).

CLASSIFICATION OF SIX MILE LAKE AS A STREAM
The trial court properly concluded that the body of water known as Six Mile Lake constitutes a stream as opposed to a lake, thereby making applicable the rules of property provided by LSA-C.C. arts. 455 and 509.
The rule of State v. Erwin, 173 La. 507, 138 So. 84 (1931), as to what constitutes a lake has been overruled sub silentio in Amerada Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So.2d 61 (1943), hereinafter referred to as "first Amerada"; Amerada Petroleum Corporation v. Case, 210 La. 630, 27 So.2d 431 (1946), hereinafter referred to as "second Amerada"; Esso Standard Oil Company v. Jones, 233 La. 915, 98 So.2d 236 (1957); and State v. Cockrell, 162 So.2d 361 (La. App. 1st Cir. 1964), writ refused, 246 La. 343, 164 So.2d 350.
In first Amerada the Supreme Court in 1943 established clear and finite definitions concerning the classification of a body of water as a lake versus a stream or a river:
"It will be noted, from an examination of the quoted portion of his opinion, the trial judge holds that the body of water known as the arm of Grand Lake can not be classified as a river, because it does not possess well defined banks or walls as are required of rivers, and, on the other hand, that it can not be classified as a lake, because its waters are not still or dead and they are not supplied from drainage as is required of lakes. However, his holding is that the arm of Grand Lake is a body of flowing water, and therefore it constitutes a stream within the meaning of the term, `or other stream' referred to in Article 509 of the Civil Code. He reasons very logically that the `other stream' referred to in the article includes streams falling into the category of rivers. This inclusion covers the case here, because the stream involved possesses all the characteristics of a river in its ability to remove and deposit the soil.

* * * * * *
"The trial judge held that the arm of Grand Lake is a stream of flowing water and that Article 509 of the Civil Code applies to the alluvion on its banks. Regardless of the characterization of the water as a river or merely as a flowing stream, the conclusion reached by the trial judge is correct." (Amerada Petroleum Corporation v. State Mineral Board, 14 So.2d, at 69, 72Emphasis added)
First Amerada was followed in 1946 by second Amerada, wherein the Louisiana Supreme Court classified land in question as alluvion formed in arm of Grand Lake, and hence belonging to the owner of the riparian property pursuant to LSA-C.C. art. 509, rather than belonging to the State. This decision necessitated a continued classification of the body of water as a running stream, thereby making applicable Article 509 of the Civil Code, rather than as a lake, to which Article 509 does not apply.
The Louisiana Supreme Court next addressed itself to this question in Esso Standard Oil Company v. Jones, cited supra. In this case the Supreme Court again quoted approvingly from the trial judge's classification of an abandoned Mississippi River cut-off as a running stream to which the rule of alluvion set forth in Article 509 applied, rather than as a lake, because, inter *415 alia of the stream's ability to carry alluvion and deposit it along its banks:
"`In the present case at the present time there is not a constant or continuous flow at low water around the bendway every day in every year, but definitely the bendway is not a lake. When it does flow it is not drainage and the bendway gets its water from the main body of the Mississippi River. A stream is not required to flow every minute of the time. In this case the bendway is characterized by definite banks on each side, a definite bed, a natural current always downstream with the main body of the Mississippi River being the source of water supply. The current is capable of carrying alluvion and of depositing it along the banks. These characteristics fulfill every possible requirement of a stream and prevent the Deer Park Bend channel from being classified as a lake or pond up to this time. That location may change some time in the future becoming a dead lake, but it has not done so at this writing.'" (Esso Standard Oil Company v. Jones, 98 So.2d, at 244 Emphasis added)
Then came this Court's opinion in State v. Cockrell, cited supra, which dealt with the very same body of water and much of the same land mass and surrounding land areas. This Court in Cockrell reviewed the trial court's findings of fact, and on the basis thereof made findings comparable to the trial court, holding as follows:
"We conclude, therefore, Six Mile Lake is a stream as distinguished from a lake considering it is shown to be a body of water containing currents of sufficient velocity to carry alluvial materials. Moreover, the record conclusively shows the flow of water entering Six Mile Lake and causing its currents is not the result of drainage but the natural movement or flow of the waters of the Atchafalaya River passing through the waterway known as the Atachafalaya Basin on its way to the sea. Because the banks of Six Mile Lake are not well defined as in the case of rivers, the body of water in question must be characterized as a stream rather than a river. Technically speaking, Six Mile Lake appears to be a segment of the Atchafalaya River. The record in the case before us leaves not the slightest doubt but that Six Mile Lake does in fact annually carry off a substantial portion of the tremendous volume of water flowing to the sea through the Atchafalaya River. It further appears beyond question, this condition antedated 1812 and has continued to the present time.
"It follows, therefore, Six Mile Lake was a stream in 1812 within the meaning and intendment of the term `other stream' as used in Article 509, LSA-C. C., consequently the provisions of said article are applicable to the case at bar as held by the learned trial court." (State v. Cockrell, 162 So.2d, at 373 Emphasis added)
It is significant to note that the Supreme Court denied the State's application for a writ of review, without any dissent, stating that, "[on] the facts found by the Court of Appeal we find no error of law in the judgment complained of." (State v. Cockrell, 246 La. 343, 164 So.2d 350Emphasis added) By denying the application for certiorari or writ of review in State v. Cockrell, the Louisiana Supreme Court obviously sanctioned this Court's opinion based on its adherence to first Amerada, second Amerada and Esso Standard Oil Company v. Jones and this Court's concomitant refusal to apply the conflicting standard for classifying a body of water as a lake versus a stream as set forth in State v. Erwin, cited supra.
The record contains ample evidence supporting the trial judge's conclusion that Six Mile Lake factually is a running stream within the meaning of the statutory law and afore-mentioned jurisprudence, as distinguished from a lake. Dr. Reinhard A. Steinmayer, geologist, testified that the entire Atchafalaya Basin, as well as Six Mile Lake, has the characteristics of a *416 stream in that it is a body of flowing water which follows a longitudinal trench and has the power to erode and transport sediments. He found that the waters of the stream swing lazily from shore to shore. Examination of alluvial fans at the head of Grand Lake indicate they slope downward and do not have flat tops as would be expected in the case of lakes. In 1960, he conducted tests which showed the stream had a mean bank velocity of 0.68 miles per hour, minimum channel velocity of 1.55 miles per hour, and maximum mean channel velocity of 2.2 miles per hour. Tests taken in 1967 during periods of low water showed currents of slightly less velocity. The absence of stagnant water and peat deposits, which are customarily found in lakes, also confirmed his opinion that the water body is a stream. He found that Grand Lake has a slope or gradient, whereas lakes have flat surfaces. His study showed a gradient in Six Mile Lake greater than that found in the Mississippi River. He also noted that lakes have eroded shorelines, saucer-shaped basins, beaches and an absence of channels or thalwegs. His studies show that Grand Lake has no beaches, has a V-shaped channel or thalweg, and its entire length is marked by the engineers with mileposts signifying the water body is considered by the engineers as a segment of the Atchafalaya River. Dr. Steinmayer also observed the absence of floation, meaning water hyacinths and other floating vegetation which exists in lakes, primarily in coves or embayed areas, and which due to bacterial action sinks to the bottom and forms peat. In addition, he observed the considerable fluctuation in water levels between high and low water seasons, a characteristic of streams and the considerable discharge capacity of the water body.
Defendants' expert, John P. McDowell, geologist, corroborated Dr. Steinmayer's testimony that Six Mile Lake is a running stream. His opinion was based on tests of the sedimentary areas adjoining Barnett's Cove. These studies show the slope of the sedimentary areas is parallel to the currents in the stream, and evidence of cross-bedding in the sedimentary areas gives further indication that they were laid down by currents of moving water. In addition, he noted that aerial photographs of the area show the numerous islands building up in the center of Six Mile Lake are elongated in the direction of the current.
Dr. Willis A. Eggler, botanist, testifying on behalf of defendants, deposed that corings showed the sedimentary material in the area involved was carried there from other areas, indicating they were brought by currents. These same studies also disclosed the absence of a large amount of organic material which is ordinarily found in lakes because of the nature of the vegetation which grows in lakes.
State-Gulf offered in opposition to defendants' expert witnesses the testimony of Dr. Charles R. Kolb. The trial judge gave little weight to Dr. Kolb's testimony, however, for the following recited reasons:
"Dr. Kolb, in his testimony, attempted to analyze each of the twelve findings of Professor Steinmayer, as hereinabove set forth, and to show that they apply equally to lakes or streams or attempted to distinguish them on factual grounds. (TR.Vol. II, pp. 263-294)
"The Court has carefully considered the testimony of Dr. Kolb, and finds that it is not entitled to much if indeed any weight. Dr. Kolb's conclusion that the water body in question is a lake and not a stream (TR.Vol. II, p. 293) is based on criteria or standards which Dr. Kolb has established himself, and which completely ignore the criteria or standards for such a determination as set forth by our Jurisprudence.
"For example, Dr. Kolb (TR.Vol. II, pp. 261, 292-293) sets forth his criteria for determining whether a water body is a lake as follows:
"1. That all open lakesopen lakes are ones that have outletsAll open *417 lakes are ponded areas along a stream's path to the sea.
"2. All lakes are wider than the aggregate width of the rivers which enter them.
"3. Currents in the river entering a lake are always greater, sometimes by several orders of magnitude, than currents in the lake.
"4. That the average channel volume is rapidly filling and continually shrinking in size.
"5. That its sediment load decreases in a downstream direction.
"Applying his findings to these tests, Dr. Kolb concludes Six Mile Lake is a lake and not a stream. In so doing he has completely ignored the test established by our Jurisprudence for this determination which is, as stated in Cockrell and previously in this opinion, that, `a body of water through which a current flows or runs with such capacity and velocity and power as to form accretions is characterized as a river or stream ....'
"Dr. Kolb himself admits those facts which under the above quoted test establish that this water body is a stream. Thus, he states:
`Now, concerning current velocity, there is no doubt that there are currents in Grand Lake-Six Mile Lake. Certainly at the present time there are currents of a fairly considerable magnitude.' (TR.Vol. II, p. 271)
"Then, after citing Professor Steinmayer's measurements of current velocities, he adds (TR.Vol. II, p. 272):
'Now, we realizeI realize there are some rather considerable currents in Grand Lake and in Six Mile Lake.'
"And, in TR.Vol. II, p. 276, he states:
`I might say in summary that I just do not consider the existence of currents in a water body as being characteristic of either a lake or a stream, that they occur in both.'
"And, concerning the power to form accretions, he states:
`The lake is continually filling by either silting in its bottom or accreting to and shrinking its shoreline where the Atchafalaya enters and forms deltas, and
`It (the sediment load) decreases markedly. As I previously pointed out, three quarters of the material in suspension is deposited in the Lake area. The remainder is carried out through the Wax Lake and Lower Atchafalaya to the Atchafalaya Bay.' (Kolb, TR.Vol. II, p. 293)
"Thus, not only does Dr. Kolb ignore the criteria established by our Jurisprudence to determine this Lake v. Stream issue and substitute therefor his own unsupported and undocumented criteria, but he in fact admits the existence of those facts necessary under our Law and Jurisprudence to characterize a water body as a stream; i. e., the powerful currents and the ability to form accretions. He attempts to minimize the effect of these admissions by stating that they apply equally to lakes and streams and that to apply the test of the Jurisprudence to all water bodies would be to declare certain well recognized lakes to be streams. This may be, but in any case in Louisiana wherein this issue is raised, where the facts establish that a particular water body does have flowing currents of such power and velocity as to form accretions, then that water body is going to be judicially determined to be a stream until such time as the Supreme Court or the Legislature changes these criteria." (Written Reasons for Judgment, Record, pp. 1824-1826)
State-Gulf contend, however, that even if Six Mile Lake be properly classified as a stream rather than as a lake, nevertheless, *418 defendants cannot properly be decreed the owners of the land areas in controversy, which State-Gulf refer to as (1) "Barnett's Cove," (2) the "Woodland Tract," and (3) the "island area." State-Gulf contend that the area comprising "Barnett's Cove" cannot be classified as alluvion which would belong to the riparian landowners inasmuch as this area was created artifically as the result of dredging operations conducted in Wax Lake Outlet. Our review of the record satisfies us that the trial judge committed no manifest error in concluding that the preponderance of the evidence supports defendants' contention that the area comprising "Barnett's Cove" properly constitutes alluvion or accretionary build-up of a land mass which is attached to and belongs to the riparian landowners. In making this determination, the trial judge relied heavily on the expert testimony of defendants' witness, Dr. McDowell. Dr. McDowell testified that while some of the alluvion was undoubtedly comprised of dredge spoil material, nevertheless, this material was deposited as a result of the natural effects of running water rather than as a result of having been pumped into or placed directly in the "Barnett's Cove" area. While this testimony is contradicted in certain respects by expert and lay testimony offered by State-Gulf, we find no manifest error committed by the trial judge in resolving this issue adversely to State-Gulf.
State-Gulf next contend that the area referred to as the "Woodland Tract" does not constitute alluvion, but rather is an area possessing ancestral forests and has for an extensive period of time been above water at ordinary low water stages and below water at ordinary high water stages. State-Gulf contend, accordingly, that the only way defendants could be properly recognized as owners of this "Woodland Tract" would be if the Woodland Tract were properly classified as comprising the bank of a river, as defined by Louisiana Civil Code Article 455 and its 1808 precursor. We agree with this analysis, to the extent that the Woodland area is comprised of bank as opposed to alluvion, but further conclude that inasmuch as Six Mile Lake has properly been classified as a stream, the bank thereof belongs to the riparian owner under Louisiana Civil Code Article 455. Such construction of Article 455 coincides with the rule of property contained in Louisiana Civil Code Article 509 which gives alluvion to the owner of land adjacent not only to a river but also to a "stream." This holding is consistent with pronouncements made by this Court and approved by the Louisiana Supreme Court in State v. Cockrell, cited supra, and is also consistent with the Louisiana Supreme Court decisions of first Amerada and second Amerada, cited supra.
State-Gulf next contend that the third land area in controversy referred to by them as the "island area" is not alluvion which belongs to the riparian landowners, but is instead an island formed within the body of water and not connected to the bank, and thus is owned by the State in accordance with Louisiana Civil Code Article 512. We find no manifest error committed by the trial judge in resolving this issue, which of necessity involved an evaluation and analysis of the conflicting expert testimony, adversely to State-Gulf. The trial judge correctly noted that the contentions urged by the respective litigants in the instant case concerning this question were strikingly similar to those urged by the respective litigants concerning this same land mass in State v. Cockrell, cited supra. Finding no manifest error committed by the trial judge in this regard, we will not disturb his resolution of this issue.
State-Gulf also contend that the trial judge erred in adopting the alternative method suggested by the expert witness Whitaker for ascertaining the ordinary low water mark in the area in controversy. State-Gulf contend that this method is objectionable because of the "subjective nature of the selection of the low water seasons." We disagree and conclude *419 that the method used by the trial judge and his reasons for implementing the same are well founded. We discern no manifest error in the trial judge's selection of the method utilized by him to ascertain and describe the low water mark nor in his rejection of the other proffered methods for the reasons enunciated by him.[2]
State-Gulf further contend that the trial judge erred in failing to give effect herein to Act 341 of 1952, LSA-R.S. 9:1151, with respect to the lease by the State to Gulf dated April 18, 1956. We find merit in this contention. Act 341 of 1952, LSA-R. S. 9:1151, provides the following:
"In all cases where a change occurs in the ownership of land or water bottoms as a result of the action of a navigable stream, bay or lake in the change of its course or bed, or as a result of accretion, dereliction, or other condition resulting from the action of a navigable stream, bay or lake, the new owner of such lands or water bottoms, including the state of Louisiana, shall take the same subject to and encumbered with any oil, gas and/or mineral lease covering and affecting such lands or water bottoms, and subject to the mineral and royalty rights of the lessors in such lease, their heirs, successors and assigns, the right of the lessee or owners of such lease and the right of the mineral and royalty owners thereunder to be in no manner abrogated or affected by such change in ownership."
Defendant, Placid Oil Company, contends that if the foregoing statute is otherwise found to be applicable, it is unconstitutional as violative of the constitutional guarantees proscribing deprivation of property without due process of law as well as impairment of contract rights. We find no merit in the assertion of unconstitutionality of the statute in question, provided it be given prospective and not retrospective effect. It is clear that but for another statutory provision, namely, Louisiana Civil Code Article 509, the State of Louisiana and not the defendants would own the area comprised of alluvion in controversy herein. There is nothing which precludes the Louisiana Legislature from prospectively modifying by subsequent legislation such as Act 341 of 1952, LSA-R.S. 9:1151, the effect which would otherwise obtain by virtue of Civil Code Article 509. There is nothing discriminatory in the 1952 legislative act in question, as it applies equally in favor of or against the State as it does in favor of or against private landowners. The Louisiana Legislature could have repealed in toto Louisiana Civil Code Article 509, following the effective date of which legislative repeal alluvion would remain the property of the State instead of becoming the property of riparian landowners. The fact that the 1952 legislative act in question simply modifies the effect of, rather than repeals entirely, Louisiana Civil Code Article 509, does not gainsay its constitutionality when applied prospectively. The foregoing pronouncements likewise apply with respect to changes in the ownership of true water bottom areas which become banks of rivers or streams to which Civil Code Article 455 applies.
The effect of this determination is that by virtue of Act 341 of 1952, LSA-R. S. 9:1151, any changes in the ownership of land or water bottoms following April 18, 1956, the date of the lease from the State of Louisiana to Gulf, are without prejudice to the interests deriving from such mineral lease and the new owner or owners of such land or water bottoms take the same subject to and encumbered with such lease.
In accordance with the discretion vested in this Court by Louisiana Code of Civil Procedure Article 2164 and applicable jurisprudence, we will remand this suit to the trial court for the limited purpose of permitting the litigants to establish the ordinary low water line in the areas in controversy as of April 18, 1956. All land areas *420 in controversy owned by defendant landowners and located on the landward side of the low water line as it is found to have existed on April 18, 1956, shall be unaffected and unencumbered by State Lease Number 2963, whereas all land areas located on the water side of the ordinary low water line as it is determined to have existed on April 18, 1956, will be affected by the afore-mentioned lease to the extent to which that lease purports to encompass such areas.
The case is also remanded to the trial court for the correlative purpose of ascertaining whether any judgment should be rendered against Placid and in favor of State-Gulf for the value of oil and gas which may have been produced from or properly be attributable to the land areas in question located on the water side of the ordinary low water line as same is determined to have existed on April 18, 1956, as well as ascertaining the rights, if any, of Placid to be reimbursed for allocable drilling costs and allocable daily operation costs of any of the three wells in question.
We find no merit in Placid's alternative contention that its Lease Number 3643, dated February 24, 1960, covering Tract Number 7722, encompasses the disputed areas, and that Gulf's Lease Number 2963, dated April 18, 1956, covering Tract Number 3643, does not.
The recorded lease to Gulf in 1956, describes the southern boundary of Tract 3643 as "the meanders of the original shoreline of Six Mile Lake." However, the plat attached to this lease outlining the leased area in red establishes the southern boundary of Tract Number 3643 at the then existing shoreline of Six Mile Lake, not the original meander line lying to the south thereof.
Placid's 1960 recorded lease describes the northern boundary of Tract 7722 as the southern boundary of Gulf's Lease Number 2963. The plat attached to Placid's recorded lease, showing in red the outlines of Tract 7722, shows the northern boundary of said tract conformable with the original meander or shoreline, and not the then existing shoreline. According to the plats attached to each lease, the southern boundary of Gulf's lease did not touch the northern boundary of Placid's lease. Moreover, the property on which subject wells are situated lies between the original meander or shoreline and the existing shoreline. Therefore, based on the plats attached to the original leases, neither lease encompassed the area on which subject wells are situated inasmuch as the wells lie above the northern boundary of Placid's lease and below the southern boundary of Gulf's lease.
On November 23, 1962, an officer of Placid executed an affidavit which, after describing the property embraced in Tract 7722 covered by Placid's Lease 3643, recited the following:
"* * * through error and inadvertence, an unofficial plat which was not referred to in the said lease was annexed thereto; that the said plat does not describe the property leased and intended to be leased to the lessee named and constitutes no part of the lease agreement, which said lease agreement specifically refers to a plat on file in the State Land Office at Baton Rouge, Louisiana, where the property covered by the said lease is more fully shown and outlined in red on the official plat in the STATE Land Office; that the said plat attached to the said lease should therefore be disregarded and reference made to the official plat on file in the State Land Office to show the property actually described in the said lease agreement."
State-Gulf offered a certified copy, dated August 1, 1962, by the Registrar of the State Land Office, of the plat on file in the land office showing the extent of Gulf's lease. This plat shows the existing shoreline, and not the original meander line as the southern boundary of Gulf's lease. Interestingly enough, Placid offered copies of two plats certified by the Registrar *421 of the State Land Office, also dated August 1, 1962, showing the boundaries of Placid's lease. One such plat indicates the northern boundary of Placid's lease as following the original meander line and not the existing shoreline as claimed by Placid. The other plat delineated the northern boundary of Placid's lease by two red lines, one following the original meander line, and the other along the existing shore; this latter plat also having two marks drawn on the line which tracked the original meander line.
On February 21, 1963, the State Mineral Board adopted a resolution declaring that Gulf's lease included all of the area designated on the plat on file in the State Land Office which was distributed with the Notice to Bidders published by the Board in connection with the execution of Gulf's Lease Number 2963. That plat delineated the southern boundary of Gulf's lease as the original meander line. The declared purpose of this resolution was to settle any uncertainty concerning the boundaries of Gulf's lease. The resolution was ordered filed in the State Land Office, and declared that it confirmed the extent of Gulf's lease.
Placid claims the area to the existing shoreline on the ground that its lease calls for its northern boundary to be Gulf's southern boundary, and that the plat attached to Gulf's map shows the southern boundary of the Gulf tract to be the existing shoreline.
In so contending, Placid relies upon the well established rule of law that where property is described in reference to an attached plat, the plat controls in the event of any discrepancy in description between the worded description in the lease or deed and the plat-indicated boundaries thereof. Maginnis Land & Improvement Company v. Marcello, 168 La. 997, 123 So. 653 (1929); Werk v. Leland University, 155 La. 971, 99 So. 716 (1924). Placid also relies upon the elementary rule of law that any act pertaining to immovable property, including mineral rights, must be recorded upon the public records to affect third parties. LSA-C.C. arts. 2264, 2266; LSA-R.S. 9:2721-2722. Placid also points out that changes may be made between parties to a recorded instrument to reflect the true intent of the parties, but that such changes may not be made to the prejudice of intervening rights of third parties. Blevins v. Manufacturers Record Publishing Company, 235 La. 708, 105 So.2d 392 (1957).
We are in complete accord with the foregoing principles advanced by Placid. These principles, however, do not warrant adopting Placid's position, inasmuch as such position is based on a self-contradicting basis. In effect, Placid seeks to defeat Gulf's claim to the disputed area on the contention that the plat attached to Gulf's lease defines the limits thereof. At the same time, Placid insists that the worded description in its lease should prevail over the platted delineations attached thereto. The obvious answer to this contention is that the rule of law, which says that the plat prevails in such instances, applies equally to Gulf and Placid. Placid's original lease limits Placid's northern boundary to the original shore or meander line. Until Gulf obtained its correction from the State Mineral Board, Gulf's lease extended southerly only to the existing shoreline. Upon correction of Gulf's lease, the southerly boundary thereof extended to the original meander line. This in no way affected Placid's rights since Placid's lease did not extend northerly beyond the original meander line.
Although Gulf's lease purports to extend to the original meander line, its effect, as previously indicated, extends only to the ordinary low water line as such is determined on remand to have existed as of April 18, 1956.
The remaining issue concerns appellants' complaint of assessment of court costs in favor of Placid and Texaco. Our review of the record fails to disclose any *422 manifest error committed by the trial judge in making these awards of court costs and expert witness fees and the amounts thereof. Nor do we in our discretion, by virtue of reversing in part and remanding these proceedings for the limited purposes set forth above, consider any modification of the assessment of court costs and expert witness fees warranted. The costs incurred by Placid and Texaco are, for all practical purposes, attributable solely to issues which have been resolved herein in their favor and adversely to appellants. We accordingly affirm the assessment of costs in the trial court to State-Gulf. We recognize that the State is exempt from all court costs except certain stenographer's costs and fees as provided by LSA-R.S. 13:4521. Whatever portion of the court costs as assessed in the trial court are not paid by the State are assessed to appellant, Gulf Oil Corporation. One-half of the costs of this appeal are assessed in solido to the State and to Gulf Oil Corporation, with the proviso that whatever portion thereof the State is exempt from paying pursuant to LSA-R.S. 13:4521, such costs shall be paid by appellant, Gulf Oil Corporation. The other one-half of the costs of this appeal are assessed to appellees in solido.
For the foregoing reasons, that part of the judgment appealed from which orders State Lease Number 2963 dated April 18, 1956, to Gulf Refining Company cancelled and annulled insofar as it purports to affect the property described in the judgment, is reversed and the suit is remanded for the purpose of determining the extent, if any, of the applicability of that lease to that area lying on the water side of the ordinary low water line as same is determined to have existed on April 18, 1956. Similarly, that part of the judgment appealed from which recognized Placid Oil Company, J. Ray McDermott and Company, Inc., and Texaco, Inc., as the valid owners of oil, gas and mineral leases affecting all of the property described in the judgment appealed from is likewise reversed and the suit remanded for the purpose of determining what part, if any, of the land area in question is validly covered by State Lease Number 2963, dated April 18, 1956, to Gulf Refining Company, that is, on the basis of the ordinary low water line as same is determined to have existed on April 18, 1956. In all other respects the judgments appealed from are affirmed.
Affirmed in part, reversed in part and remanded.
LANDRY, J., dissenting.
TUCKER, J., concurring.
LANDRY, Judge (dissenting).
Notwithstanding I was the organ of the court in State v. Cockrell, 162 So.2d 361, writ refused 246 La. 343, 164 So.2d 350, I dissent from the majority ruling that Six Mile Lake is a stream as distinguished from a lake.
Upon further consideration of the lakestream question, it is my opinion that the decision in Cockrell was erroneous in relying upon Amerada Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So.2d 61 (First Amerada); Amerada Petroleum Corporation v. Case, 210 La. 630, 27 So.2d 431 (Second Amerada), and Esso Standard Oil Company v. Jones, 233 La. 915, 98 So.2d 236.
I readily recognize that the rule which evolved in First Amerada, Second Amerada and Jones, above, conflicts with the principles established in State v. Erwin, 173 La. 507, 138 So. 84. However, further study of this most perplexing issue leads me to the conclusion that Erwin, which has never been expressly overruled, represents the better line of authority and should be followed.
Pertinent to the lake-stream issue is the history of the Atchafalaya Basin as disclosed by the record. In this regard, the evidence discloses that Six Mile Lake is *423 the lower or southerly portion of a large body of water known as Grand Lake-Six Mile Lake which naturally courses in a southeasterly direction. At the lower (Six Mile Lake) end, the water body runs almost due easterly before connecting with Flat Lake and Berwick Bay which eventually empty into the Gulf of Mexico, below Morgan City, Louisiana. It is conceded that Six Mile Lake forms part of what is known as the vast Atchafalaya Basin through which now flow the waters of the Atchafalaya and Red Rivers. It is also undisputed that this immense basin includes innumerable water bodies of diverse sizes, widths and depths, which are and have been for many years variously designated on official maps and charts as rivers, lakes, bays and bayous.
The formation of the Atchafalaya Basin (Basin), as related by State-Gulf witness, Charles R. Kolb, Geologist and long time employee of the United States Corps of Engineers (Engineers), is for all practical purposes, undisputed in the record. Predicated upon ancient documents and maps, together with reports, studies and surveys conducted by the Engineers, Mr. Kolb explained that the entire Basin from its northern extremity at Old River to its southern terminus at the Gulf of Mexico, and from east to west, roughly the longitude of New Orleans (the Lafourche Ridge on the east) to the longitude of Lafayette, the Teche ridge on the west, exists today because in prehistoric times, the Mississippi River abandoned courses in this area. In former times, according to Mr. Kolb, the Mississippi River flowed through Bayou Teche, Bayou Lafourche and Bayou Plaquemine, all of which are part of the Basin, on its way to the sea. These conclusions were based on detailed studies of the Basin undertaken by the Engineers involving years of work and research in the form of borings and study of carbon deposits found in the various courses in the Basin. It appears that for a long time, only a relatively small amount of water entered the Basin from the north, there being no large rivers entering the area. During this period, a small amount of water entered the northern end of the Basin via Red River through Raccourci Bend, Bayou Lettsworth. Lafon's maps of 1805 show a tremendous bend in the Mississippi near the confluence of the Mississippi, Red and Atchafalaya Rivers at the northern end of the Basin. At this point, the Mississippi curved slightly to the northwest, thence south, thence east until it formed a giant horseshoe before continuing southerly on its way to the sea. The Red River entered this horseshoe near what can be described as the northwesterly segment thereof. The Atchafalaya is shown as a very small stream exiting from the southwestern section of the horseshoe. The Atchafalaya, as it then existed, appears to have contributed only a small portion of the waters of the Red and Mississippi Rivers to the Basin, principally at stages of high water. By 1839, the Mississippi cut through the eastern or open end of the horseshoe by excavating a natural channel between the northern and southern arms of the bend or horseshoe. The land area encompassed by the bend became known appropriately as Turnbull Island. The upper arm of the horseshoe, formerly occupied by the Mississippi, became known as Upper Old River and the lower arm was designated Lower Old River. In 1839, the Red River sought a section of Old River as an outlet because the Atchafalaya was inadequate to receive all of the Red's waters. Apparently the upper arm of Old River was chosen.
Surveys made by Louis Hebert, State Engineer, in 1854-55, indicated the Red River was being forced almost entirely into the upper arm of Old River and that the lower arm was being closed off. This situation prompted excavations to maintain connections between the Mississippi and Atchafalaya Rivers, and also to direct the waters of the Red River into both the Mississippi and Atchafalaya Rivers. By 1883, the upper arm of Old River had almost silted over, but the channels between the Mississippi and the Atchafalaya and the *424 Red and the Atchafalaya, and from there into the Mississippi, were still open and intact. Between 1830 and 1880, it appears that only the waters of the Red River entered the Atchafalaya River. In the 1880's, the channel between the Mississippi and Atchafalaya began to silt up and had to be kept open by dredging. From the 1880's until 1940, an increasing volume of the Mississippi continued to flow into the Atchafalaya. The increasing volume of this flow posed the threat of the Atchafalaya "capturing" the Mississippi. This most undesirable result was prevented by dredging and the construction of certain control structures which prevented the flow of the Mississippi into the Atchafalaya. In connection with this particular work, and to enable the Atchafalaya to effectively handle the increasing flow it was receiving, the Engineers have, since the 1930's, dredged selected sections of the Atchafalaya system creating channels to speed the flow of water and enable the Atchafalaya system to handle its increasing load. A considerable amount of dredging was done in the Grand Lake-Six Mile Lake area commencing in the 1930's. Since this time channels have been dug and annually maintained north or above Grand Lake-Six Mile Lake, through Grand Lake-Six Mile Lake and below or south of Six Mile Lake in the form of Wax Lake Outlet which was dredged commencing in 1938 and was completed by January, 1940.
Between 1917 and 1930, deltas formed at the north end of Grand Lake as the result of deposits of dredged materials being carried to those points from channel excavations above. Since 1930, the sedimentation has extended longitudinally down the central portion of Grand Lake-Six Mile Lake, forming comparatively narrow channels on the east and west sides thereof. The navigation channel being maintained in Grand Lake by the Engineers is the present western channel of Grand Lake-Six Mile Lake which empties into Wax Lake Outlet which commences just west of the southernmost tip of Six Mile Lake. The aim of the Engineers is to ultimately construct a channel of sufficient depth, through the entire area, to produce currents capable of carrying sedimentation out of Six Mile Lake. It is anticipated that eventually there will be but one channel through Grand Lake-Six Mile Lake, with spoil banks on either side in the nature of levees.
Studies conducted by the Engineers show that 75% of the sediment in Grand Lake-Six Mile Lake, including that generated by dredging operations above and within the lake, are deposited in the lake because of its relatively slow currents, which circumstances explains the islands being formed in the center of the water body. The remaining 25% of sediment is being carried into Wax Lake Outlet and Atchafalaya Bay into which Six Mile Lake presently flows. Darby's 1816 field notes show that at that time, Six Mile Lake was almost placid at times, but that there was considerable flow therein during stages of high water.
Also germane to the lake-stream issue are certain general facts concerning Grand Lake-Six Mile Lake which are either conceded or conclusively established.
It is undisputed that the Grand Lake-Six Mile Lake segment of the Basin is approximately thirty miles long, and that it varies in width from three to ten miles. The southern end of Six Mile Lake, with which we are here concerned, is approximately three miles wide. With the exception of the navigation channel dredged and maintained by the Engineers, the water body varies in depth from a few inches to approximately five feet. The lake is subject to tidal action. Also conceded is the fact that the water body has currents capable of carrying sedimentation.
Maps of the Basin disclose that the three main sources through which the waters of the Atchafalaya eventually find their way into Grand Lake are: (1) the Arm of Grand Lake, a comparatively short and narrow body which enters Grand Lake at *425 what might be designated as the northeast sector of Grand Lake; (2) Lake Chicot, a fairly large water body which lies generally east of the Arm of Grand Lake and which has three or four separate outlets into Grand Lake, and (3) Lake Fausse Pointe, a comparatively large body of water which empties into the northwest sector of Grand Lake. South of Lake Chicot, along the eastern shore of Grand Lake, numerous bayous and other bodies of water flow into Grand Lake. On its western shore below Lake Fausse Pointe, Grand Lake is fed almost exclusively by Bayou Teche which enters Grand Lake below the section of Six Mile Lake with which we are here concerned. In its original state, currents flowed through the water body with sufficient velocity to carry sediments and make alluvial deposits, especially during seasonable periods of high water.
As is to be expected, the record contains conflicting expert testimony regarding whether the body of water in question is a lake or stream.
State-Gulf offered the testimony of experts to establish: (1) Six Mile Lake is a true lake as opposed to a river or stream; (2) If Six Mile Lake is a stream, Barnett's Cove and the Island Area did not form as alluvion extending outward from the shore, but as an island detached from the shore, and consequently, title thereto vested in the State, not defendants as riparian owners, and (3) That the buildup in Barnett's Cove and the Woodland Area did not result imperceptibly from natural causes, but as the result of the acts of man in the form of dredge spoil pumped into the area during the construction of Wax Lake Outlet.
Conversely, defendants produced experts to establish: (1) Six Mile Lake was a flowing stream in 1812 because it had then, and has now, currents in it capable of carrying alluvial deposits; (2) Barnett's Cove was filled in by alluvion carried by the currents of Six Mile Lake; (3) The Island Area was formed of alluvial deposits laid down by the currents of Six Mile Lake, and was attached to the shore in its early stages of formation but, due to natural conditions, first emerged above water as an island outward from the shore, and (4) The Woodland Area existed as a primeval cypress and tupelo gum forest above the ordinary low water mark of Six Mile Lake for hundreds of years prior to 1812 until the present.
My reading of the record convinces me that the majority have accurately analyzed the testimony of defendants' witnesses, Dr. Rhinehard A. Steinmayer and John P. McDowell, Geologists, and Dr. Willis A. Eggler, Botanist.
On the other hand, however, the testimony of defendants' aforenamed experts was contradicted by that of State Gulf's chief witness, Dr. Charles R. Kolb, Geologist, in the employ of the U. S. Corps of Engineers, who considered Six Mile Lake to be a lake as distinguished from a stream. Dr. Kolb defined a lake as a fairly large sized body of water occupying a depression in the earth's surface, and which can be open or closed. He noted that many lakes have outlets; not all are stagnant, and many have outflow. He stated that currents occur both in lakes and streams, and that the velocity of stream currents entering a lake is greater than that of the currents in the lake itself, which is the case in Six Mile Lake. Dr. Kolb found that Grand Lake is approximately twenty times wider than the Atchafalaya which enters it; that currents lessen materially within the lake; that it is saucer or dish shaped as are numerous other Louisiana marsh lakes, and that thalwegs or channels are common to both lakes and streams. He stated that the fact that the Engineers were maintaining an artificial channel in the lake was no indication the Engineers considered the body of water a stream, and neither was the erection of milepost signs an indication that the water body was a stream. In a river sedimentation increases in a downstream direction; in a lake it decreases. In Grand Lake, 75% of the sedimentation is being deposited in the lake, only 25% being carried *426 downstream. In his opinion, the presence of peat deposits are not necessarily characteristic of lakes, neither is the presence of floaton. Beaches, in his opinion, are as prevalent on lakes as rivers or streams. In his opinion, stratification and cross-bedding (as found by McDowell) are characteristic of deltaic lake deposits.
The majority have accepted defendants' contention that the testimony establishes subject water body as a stream which the two Ameradas, Jones and Cockrell cases define as bodies of water having well defined banks through which currents flow with sufficient velocity to carry alluvion and sedimentation. These same authorities, according to the majority, define lakes as large bodies of water which are more or less stagnant, which are not fed by flowing streams, but by drainage and which have no currents capable of carrying alluvion.
The reasons for my change in position on the lake-stream issue will be more readily understood in the light of my analysis of the positions of the opposing parties and the authorities cited by each in support thereof.
State-Gulf contends the Amerada and Cockrell decisions are erroneous in holding that any body of water having currents sufficient to carry alluvion are "other streams" within the contemplation of Articles 509 and 510, above. State-Gulf also contends this court erred in holding in Cockrell, above, that the Amerada and Jones decisions, above, reversed Erwin, above, which later authority held Calcasieu Lake to be a lake notwithstanding the Calcasieu River flowed through the lake on its route to the Gulf of Mexico. In addition, State-Gulf argues that this court erred in its Cockrell holding that the sole criteria for determining whether a water body is a river or stream, as distinguished from a lake, is its ability to carry alluvion. State-Gulf concedes that LSA-C.C. arts. 509 and 510 confer title to the banks of rivers and streams (to the ordinary low water mark) to the riparian owners, but that this court erred in holding, in Cockrell, that Articles 509 and 510, above, apply to water bodies of the nature involved herein, that is, large expanses of wide water bodies which are lakes rather than rivers or streams.
In support of its position, State-Gulf relies upon a long line of authorities which it is contended have consistently held that water bodies of a nature similar to Grand Lake-Six Mile Lake are not rivers or streams but lakes, namely; Zeller v. Southern Yacht Club, 34 La.Ann. 837 (1882); Sapp v. Frazier, 51 La.Ann. 1718, 26 So. 378 (1899); Slattery v. Arkansas Natural Gas Company, 138 La. 793, 70 So. 806 (1916); State v. Capdeville, 146 La. 94, 83 So. 421 (1919); Atchafalaya Land Co. v. James, 146 La. 109, 83 So. 426 (1919); State v. Bozeman, 156 La. 635, 101 So. 4 (1924); Gulf Refining Company v. Grace, 165 La. 979, 116 So. 405 (1928); State v. Erwin, 173 La. 507, 138 So. 84 (1931); State v. Jefferson Island Salt Mining Company, Inc., 183 La. 304, 163 So. 145 (1935); Miami Corporation v. State, 186 La. 784, 173 So. 315 (1937); Doiron v. O'Bryan, 218 La. 1069, 51 So.2d 628 (1951).
State-Gulf also points to a series of cases involving Lake Ponchartain, including Zeller, above; Milne v. Girodeau, 12 La. 324; Bruning v. City of New Orleans, 165 La. 511, 115 So. 733, and New Orleans Land Company v. Board of Levee Com'rs of Orleans Levee Dist., 171 La. 718, 132 So. 121, as authority for the principle that a large body of water, such as that involved herein, is deemed a lake even though a river flows through it creating currents capable of eroding banks and carrying alluvion. My consideration of these authorities indicate that in each case the outcome hinges on the finding that the alluvion and dereliction rules prescribed in Articles 509 and 510 do not apply to an arm of the sea into which category Lake Ponchartrain falls. However, the Court, in Zeller, in disposing of plaintiff's contention that Lake Ponchartrain is not an arm *427 of the sea, stated it was sufficient "... to say, that the only acknowledged right to accretions as to property under our law, are those formed on rivers and running streams; and that there is no recognition of any property right therein, when formed on lakes, bays, arms of the sea or other large bodies of water, and that the modes or ways of acquisition of property are limited to those expressly prescribed by law and cannot be extended by implication."
In New Orleans Land Company, above, plaintiff sought compensation for expropriated lands which had, in part, eroded into Lake Ponchartrain. In rejecting plaintiff's demand with respect to the eroded area, the court observed:
"In determining the issues involved in this case, it is of no practical value to ascertain whether Lake Ponchartrain should be classed as a salt-water tidal lake or a freshwater inland navigable lake. The legal situation with which we are concerned here is the same in either case. The water bottoms of both classes of lakes are owned by the state to the high-water mark." (Citation of numerous cases omitted.)
In Sapp v. Frazier, 51 La.Ann. 1718, 26 So. 378, plaintiff claimed title to a portion of the bed of Lake Bisteneau, on the ground that it was an alluvial addition. The lake versus stream issue, as such, was neither raised nor discussed. It appears all concerned considered the water body a lake. The court held against plaintiff on the ground it was unnecessary to determine whether plaintiff possessed riparian rights because the evidence showed the disputed area was neither accretion nor dereliction in that no land was added to the shore, but rather the area was one which was merely exposed during periods of low water. The court also noted that if the area were in fact alluvion, plaintiff established no title thereto because his deed did not specifically include same.
Slattery v. Arkansas Natural Gas, 138 La. 793, 70 So. 806, which concerned Sodo Lake, Caddo Parish, is pertinent primarily in that it declares alluvial rights of riparian owners exist only because of LSA-C.C. arts. 509 and 510, which confer such rights as to rivers and streams. No mention is made of whether Sodo Lake is a true lake or a river or stream. I note, however, that Slattery cites with approval the rule announced in Zeller to the effect that the modes of acquisition of property are limited to those expressly prescribed by law and cannot be extended by implication.
State v. Capdeville, 146 La. 94, 83 So. 421, involved a claim by the Board of Commissioners of the Atchafalaya Basin Levee District and its assignee, Atchafalaya Land Company, to the beds and bottoms of Lake Rond, Lake Dauterive and Lake Fausse Pointe (in the Atchafalaya Basin). The levee Board claimed title through Act 97 of 1890, pursuant to which the State granted it Swamp Lands obtained from the Congress of the United States. The lake-stream issue was not made a point in Capdeville. I find that Capdeville held adversely to plaintiff's contention on the ground that the lands in question were not transferred to the state under the Swamp Lands Act which transferred only lands subject to reclamation by artificial means, and the areas in controversy did not fall into that category.
Atchafalaya Land Co. v. James, 146 La. 109, 83 So. 426, involved the beds of Lakes Rond, Dauterive, Fausse Pointe and Little Lake Rond. The court held therein that, for the same reasons given in State v. Capdeville, the land belonged to the state rather than plaintiff.
State v. Bozeman, 156 La. 635, 101 So. 4, involved claims to the bed of Cross Lake, Caddo Parish. No specific lake as distinguished from river or stream issue, was raised or considered. The court found the sole question was whether Cross Lake was a navigable water body in 1812. It appears the court and all parties conceded *428 Cross Lake was a true lake. The decision held that the State's title was to the high water mark.
In Gulf Refining Company of Louisiana v. Grace, 165 La. 979, 116 So. 405, plaintiff, as lessee of the bed of Lake Fausse Pointe sought to enjoin the state from granting a lease to third parties on all the islands and lands in that water body. There was no specific consideration of the lake as opposed to river or stream concept. Apparently all concerned conceded Lake Fausse Pointe was a lake, and apparently the court treated it as such. The court simply decided that the property in dispute (certain islands) in the lake were part of the bed of the lake and included in plaintiff's lease.
State v. Erwin, 173 La. 507, 138 So. 84, concerned the title to land bordering Calcasieu Lake, which lands, though once above water, were submerged beneath the surface due to the effect of washing by waves. Riparian owners contended the state owned the bed of the lake only to the high water mark in 1812, and even though their lands had become submerged, they still retained private ownership thereof. The strip in dispute varied in width from 50 to 1,000 feet and was several thousand feet long. Calcasieu Lake was found to be about 18 miles long and from about four and one-half to twelve to fourteen miles wide. The Calcasieu River enters the lake on its northern end at which point the river is about 600 feet wide. North of the lake, the river is considerably deeper than the lake. The river channel through the lake is slightly deeper than the rest of the lake. During high water a perceptible current runs through the lake. In ordinary stages of water, there is little if any channel current. In stages of high water, there is perceptible current near the area involved. The rate of erosion at the area in question was at the rate of 5 to 6 feet yearly. The lake is affected by tides; its waters are usually fresh but sometimes brackish, becoming quite salty under certain weather conditions. The lake had a depth of about six feet except in the channel which was slightly deeper. Citing State v. Bozeman, above, the Court held that Calcasieu Lake was a lake, and that the state owned its bed and bottom to the high water mark. The Court noted that in France, Calcasieu Lake would be considered a section of the Calcasieu River because, in France, where a river flows through a lake, the laws of accretion and dereliction apply to the lake. Citing as authority Jones v. Lee, 77 Mich. 35, 43 N.W. 855, the Court held that even though a river or stream flows through a body of water, it does not characterize the latter a theoretical expansion of the former, and does not change the classification of the latter from a lake to a river or stream. The court then noted that a river is characterized by confining channel banks which give it a substantially single course throughout. A lake, however, occupies a basin of greater or lesser depth, and may or may not have a single prevailing direction. Citation of authorities followed.
The Court then held that since a riparian owner does not acquire accretion on a lake, he should not lose that which is submerged by erosion of his shore line.
The State urges that Erwin is an application in reverse of the equitable principle underlying our laws of accretion and dereliction as expressed in Succession of Delachaise v. Maginnis, 44 La.Ann. 1043, 11 So. 715, because it was only by holding Calcasieu Lake a lake could the riparian owner retain title to the submerged area; if it were held a river, the loss by dereliction would accrue to the State under Articles 509 and 510. Defendants say there is no codal authority for applying the aleatory concept to lakes, and the Court in so holding in Erwin, above, contravened the basic principle that the beds of navigable waters belong to the state and are not susceptible of private ownership. It is to be noted that this was the precise position subsequently taken by the Supreme Court in Miami Corporation, above.
State v. Jefferson Island Salt Mining Company, Inc., 183 La. 304, 163 So. 145, *429 merely determined that the bed of Lake Peigneur, Iberia Parish, belonged to the state by virtue of its inherent sovereignty. The lake-stream issue was not raised therein. Apparently all litigants, and the court as well, considered the lake to be a true lake.
In Miami Corporation v. State, 186 La. 784, 173 So. 315, plaintiff claimed ownership of an area which had eroded into the bed of Grand Lake, Cameron Parish. The body of water concerned was ten miles long and from three to nine miles in width. The Mermentau River flowed through the lake from north to south. Currents in the lake were found to be a considerable factor because no flats or shoals were formed in front of the receding area. It was also determined that the recession of the shore resulted from a combination of natural forces. The court in Miami discussed in detail the matter of ownership of the beds of navigable waters, and concluded that all lands which became submerged in such waters formed part of the beds thereof, and title thereto necessarily accrued to the state. The court considered Erwin, in detail, and concluded that Erwin was an attempt by the court therein to achieve equity between the state and riparian owners by holding that:
"... neither the State nor the riparian owner gaining or losing when the water line of the lake expanded or contracted. The majority opinion accomplished this result by stating articles 509 and 510 of the Civil Code with reference to alluvion and dereliction did not apply to fresh water, navigable lakes. But, in order to reach this conclusion, the court had to go counter to the long-established sound principles of public policy in our jurisprudencethat the title to the bottoms of navigable bodies of water belong to the State as a result of its inherent sovereignty and are insusceptible of private ownership."
In Miami, the court then refused to recognize Erwin as binding either on the principle of stare decisis or a rule of property.
Defendants urge that Miami, above, is authority only for the proposition that it reverses Erwin's holding that eroded areas of lakes belong to riparian owners. Defendants contend that Miami did not determine the lake-stream issue, but merely held that the beds of all navigable waters, whether lakes, rivers or streams, belong to the state. I disagree with defendant's analysis of Miami inasmuch as I note in Miami the following:
"Learned counsel for both parties litigant stated that the main point in the case is the correctness of the decision in State v. Erwin, supra, and whether or not it should be followed or overruled. They also agree that the facts in this case are so substantially similar to those in the Erwin Case that this case must be decided under the rule declared therein, in the event we reach the conclusion that the case of State v. Erwin is correct." (Emphasis supplied.)
From the foregoing, it appears that the court in Miami, and the litigants as well, considered the water body involved therein to be a lake as distinguished from a river or stream.
Defendants contend that Miami, Erwin, and the other cases relied upon by State-Gulf, were overruled by First Amerada and Second Amerada, above, which specifically held that the test of determining whether a water body is a river or stream, as compared to a lake, is its ability to carry alluvion. In this regard, defendants point out that until First Amerada, Erwin was the only case which attempted to establish criteria for the classification of rivers and streams as distinguished from lakes. Defendants argue that the Erwin ruling that a body of water is a lake if its expanse be sufficiently great, notwithstanding the existence of currents therein capable of carrying and depositing sediments, ignores our statutory rules concerning *430 alluvion and dereliction and the concept of an aleatory contract between the state and riparian owners developed by the court as the equitable basis thereof.
Defendants also note that First Amerada involves the Arm of Grand Lake, which empties into subject water body, and classified it as a stream notwithstanding it varies in width from 3960 to 4440 feet. First Amerada, according to defendants, was the initial authority to distinguish "rivers" from "other streams" by holding that rivers have well defined banks, whereas streams are bodies of running or flowing waters with the capacity of carrying substantial amounts of sediment to change their shore lines by the natural process of accretion and dereliction. Plaintiffs contend this court was wrong in finding in Cockrell that First Amerada overruled Erwin. Defendants, or course, maintain the court was correct.
Second Amerada, according to State-Gulf, effected an erosion of the First Amerada rule, and indicated a return to the Erwin rule regarding the definition of lakes. Second Amerada involved a continuation of the same alluvial area in dispute in First Amerada. I find, however, it merely held that since the area in dispute was an addition to the area involved in First Amerada, the decision in the former case was controlling. There was no discussion per se as to the lake versus stream issue. I believe there can be no mistaking, however, that in Second Amerada, all concerned, and the court as well, considered the water body involved to be a stream.
State-Gulf contends that further proof that the Amerada decisions did not overrule Erwin is found in Doiron v. O'Bryan, 218 La. 1069, 51 So.2d 628, which involved the same area which had eroded in Erwin, but which had rebuilt above high water because of spoil deposited as the result of dredging operations. In Doiron, above, plaintiff's claim to the built up area was rejected on the ground that plaintiff's deed called only for such high lands as existed adjacent to the shore at the time of plaintiff's acquisition, and did not include any submerged lands. Doiron did not expressly deal with the lake as opposed to river or stream question.
The next instance in which the definition of water bodies was involved was Esso Standard Oil Company v. Jones, 233 La. 915, 98 So.2d 236. This case concerned an abandoned channel of the Mississippi River. The court in effect held that the abandoned channel was changed in character from a river to a stream capable of carrying alluvial deposits, and that the area in dispute belonged to the riparian owners who possessed the banks of the stream.
Jones, above, was followed by our decision in Cockrell, above. Defendants maintain this court was correct when it held, in the Cockrell decision, that the two Amerada decisions and Jones, in effect, overruled Erwin, insofar as Erwin established that Articles 509 and 510 do not apply to large water bodies such as Calcasieu Lake. State-Gulf contends, on the other hand, Cockrell erred in holding Erwin to have been overruled by the two Amerada and the Jones decisions. State-Gulf also urges that Cockrell ignored the numerous authorities cited and relied upon by State-Gulf commencing with Zeller and ending with Doiron, above.
In supplemental brief, defendants argue that the size, width and depth of a water body are not determining factors in classifying bodies of water as lakes, rivers or streams. In so contending, defendants cite and rely upon 56 Am.Jur., Waters, Page 533, Section 50; 93 C.J.S. Waters, Pages 596-597, § 3; Libby, McNeil & Libby v. Roberts, 110 So.2d 82 (Fla.); Alabama v. Georgia, 64 U.S. (23 How.) 505, 16 L.Ed. 556; Howard v. Ingersoll, 54 U.S. (13 How.) 391, 14 L.Ed. 189.
In 56 Am.Jur., Waters, Page 533, Section 50, I note the following:
"Ordinarily, the controlling distinction between a stream and a pond or a lake is that in the one case the water has a natural *431 motiona currentwhile in the other the water is, in its natural state, substantially at rest. However, the existence or nonexistence of a current is not in all cases determinative of the character of the body of water. The mere fact that water is very shallow, so that marsh grass appears above the surface; that it is called a marsh; that the water is not deep enough to admit of navigation, or that the surface is not at all times wholly submerged, does not preclude its being in fact a lake. Neither does the size or depth of a body of water solve the question whether it is a lake or a stream."
I note that 93 C.J.S. Waters, Pages 596-597, §§ 3 and 4, deal with the definition of `"natural watercourses", and not the distinction between lakes, rivers and streams.
Libby, above, cites 56 Am.Jur., Waters, Section 50, page 533, including that portion thereof which indicates that the existence or nonexistence of current is not in all cases determinative of the character of a water body.
Alabama v. Georgia, above, involved a boundary dispute between the litigating states. The characterization of a body of water as a lake, river or stream was not at issue therein. Consequently, the defining therein of a river as a "body of flowing water of no specific dimensionslarger than a brook or rivulet, less than a seaa running stream, pent on each side by banks" is not decisive of the lake-stream issue involved in this present proceeding.
My examination of Howard v. Ingersoll, above, reveals that case was a boundary dispute between the States of Alabama and Georgia. The issue therein related to the location of the bank of the Chattahoochee River.
Our own jurisprudence, namely, Erwin, above, has rejected the concept that the size, width and depth of a water body are of absolutely no consequence in determining its character as a lake, river or stream, insofar as concerns our laws governing alluvion and dereliction.
The State's ownership of the beds and bottoms of navigable waters is a matter of such paramount public importance as to prompt my re-examination of Cockrell in the light of the following pertinent principles.
By virtue of its inherent sovereignty, the State acquired from the Federal Government the beds and bottoms of all navigable water bottoms in the state, whether lakes, rivers or other streams, up to the ordinary high water mark, upon the State's admission to the Union in 1812. Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331; State v. Richardson, 140 La. 329, 72 So. 984.
The beds of navigable water bodies are incapable of alienation by the State. Louisiana Constitution of 1921, Article 4, Section 2.
The only acknowledged rights to accretion to property under our law are those formed on rivers and running streams. There is no recognition of any property rights to accretions formed on lakes, bays, arms of the sea, or other large bodies of water. Zeller v. Southern Yacht Club, 34 La.Ann. 837.
The modes or acquisition of property by accretion are limited to those expressly prescribed by law, which methods cannot be extended by implication or inference. Zeller, above.
I find the unmistakeable import of the jurisprudence as expounded in Zeller, and reiterated in subsequent decisions such as Slattery v. Arkansas Natural Gas Company, 138 La. 793, 70 So. 806, establishes the principle that the rules by which public ownership of the beds and bottoms of navigable waters may be divested are to be rigidly construed in favor of public as opposed to private ownership, all doubt in regard *432 thereto being resolved in favor of the State.
It is likewise my view that Erwin and Miami Corporation, above, as compared to the Amerada decisions, Jones and Cockrell, above, represent conflicting lines of jurisprudence, and that the latter do not necessarily overrule the former. The Amerada decisions can be distinguished upon the ground that they dealt with the Arm of Grand Lake, a body of water much smaller in size than Grand Lake-Six Mile Lake. Similarly, Jones is distinguishable in that it involved an abandoned section of the Mississippi River. Cockrell, of course, is indistinguishable in that it involved the same water body with which we are here concerned. I now believe Cockrell erred in failing to apply the Erwin rule which, upon further examination, appears to me to represent the sounder view in that it is consistent with and supportive of the fundamental principle that title to the beds and bottoms of navigable water bodies belong to the State, and the alienation thereof is expressly proscribed by constitutional provision. I likewise believe that LSA-C. C. arts. 509 and 510 apply only to such rivers and "other streams" as flow more or less constantly, in relatively deep but comparatively narrow channels, between well defined banks. I also believe that large, expansive bodies of water, having relatively shallow channels and ill-defined banks, are characterized as "lakes" notwithstanding a river or stream flows through it at times and produces therein currents capable of carrying alluvial deposits. Being lakes, such large bodies of water do not fall within the term "other streams" as utilized in LSA-C.C. arts. 509 and 510.
In concluding Grand Lake-Six Mile Lake is, in legal contemplation, a lake, not a stream, I rely to considerable extent on the fact that this vast body of water measuring thirty miles in length and from three to ten miles in width, has a maximum natural depth of approximately five feet only. This natural condition, in my view, is more characteristic of a lake than a stream. I also note that Grand Lake-Six Mile Lake is of substantially the same size as Calcasieu Lake which, in legal effect, was held by Erwin to be a lake. The Erwin decision notes that Calcasieu Lake is approximately eighteen miles long and varies in width from four and one-half to twelve to fourteen miles. Although Calcasieu Lake is wider than subject water body, its length is considerably less. I note also that the depth in Calcasieu River was found to be a maximum of six feet, except for its 1000 foot wide channel which was slightly in excess of six feet deep. If Calcasieu is such a large body of water that Articles 509 and 510 do not apply thereto, in my judgment, Grand Lake-Six Mile Lake falls into the same category.
For these reasons, this court should reverse its ruling in Cockrell, and hold that subject water body is a lake to which LSA-C.C. arts. 509 and 510 regarding accretion, reliction and dereliction do not apply. Accordingly, I dissent from the contrary decision reached by the majority.
TUCKER, Judge (concurring):
TUCKER, J., concurs on the ground that the majority opinion is governed by State v. Cockrell and the two Amerada Petroleum Corporation cases cited therein. The rationale of these three cases seems to be the law of this case. However, I feel that the jurisprudence should return to the judicial expressions of State v. Erwin, also cited in the majority opinion.
NOTES
[1] LSA-R.S. 9:1151 reads as follows:

"In all cases where a change occurs in the ownership of land or water bottoms as a result of the action of a navigable stream, bay or lake in the change of its course or bed, or as a result of accretion, dereliction, or other condition resulting from the action of a navigable stream, bay or lake, the new owner of such lands or water bottoms, including the state of Louisiana, shall take the same subject to and encumbered with any oil, gas and/or mineral lease covering and affecting such lands or water bottoms, and subject to the mineral and royalty rights of the lessors in such lease, their heirs, successors and assigns, the right of the lessee or owners of such lease and the right of the mineral and royalty owners thereunder to be in no manner abrogated or affected by such change in ownership."
[2] Written Reasons for Judgment, Record, pp. 1843-1851.