## No. 13,014.

## L. R. SAPP VS. SAM. A. FRAZIER ET ALS.

### SYLLABUS.

1. Plaintiff, having title to a tract of land bordering on Lake Bistineau, claims riparian ownership of bed of lake in front of his holding.
2. To succeed (if at all), it must appear that the land he asserts riparian rights to, has become attached to the original tract either as accretions (alluvion), or dereliction.
3. If the original bed of the lake has undergone no change, if there has been no deposit forming alluvion, and no permanent subsidence of the waters uncovering land to become dereliction, he takes nothing.
4. The temporary uncovering of parts of the bed of the lake by the recurring annual ebb of the waters, to become covered again by their rise or flow at the appropriate season, does not constitute dereliction.

APPEAL from the Second Judicial District Court for the Parish of Webster. *Watkins, J.*

---

*Stewart & Stewart* for the Plaintiff and Appellant.

*L. K. Watkins* for the Defendants and Appellees.

Argued and submitted January 28, 1899.
Opinion handed down April 3, 1899.
Rehearing refused June 27, 1899.

The opinion of the court was delivered by

BLANCHARD, J.  Plaintiff, in 1896, acquired by purchase certain tracts of land fronting on Lake Bistineau, aggregating about 220 acres.

The authors of his title had acquired the land from the United States.  It is "hill" land, or "uplands."

When, many years ago, the government surveyors ran the lines of the townships and sectionized the lands of that region of country, the tracts of land in question formed fractional sections, or parts of fractional sections.

What necessitated these fractional sections was the existence of the lake and its omission from the survey.  The front, or eastern and northeastern side of these fractional sections was a meander line running around the west bank of the lake.  Between the meander line and the other, or straight, lines of the fractional sections, the government computed so many acres and disposed of the land according to such computation.

Lake Bistineau is a body of water situated in Northwestern Louisiana, forming the boundary line between the Parish of Bienville on the east and the Parish of Bossier on the west, and extending up into the Parish of Webster.  The lake is thirty or forty miles long and from a mile to two miles wide.  At its northern extremity Bayou Dorcheat flows into it, and through Loggy Bayou at its southern extremity the lake drains into Red River.

The three (Loggy Bayou, Lake Bistineau and Bayou Dorcheat) constitute a navigable waterway of the United States, to improve which Congress has repeatedly made appropriations of money, and through which steamboats approach within a few miles of the town of Minden, the county seat of Webster Parish.

Navigation through the lake for steamboats begins in January or February, and extends through the spring months into the early summer.

The lake bed is covered with water for from six to seven months in the year, and for five or six months, beginning in the summer and extending through the autumn season, the greater part of its bed is

uncovered, the waters receding and draining off into Red River.

During the season when the water is down, what is called "the low water channel," having the appearance of a small bayou, meanders through the bed of the lake. Through this drains the surplus water remaining in the lake and that which comes into it from the summer and fall rains. Sometimes the water in this channel runs—there is a current—and sometimes there is none.

The bed of the lake has never been looked upon as private property.

Those living on it and near it, and, indeed, the public generally, have regarded it as pertaining either to the United States or the State of Louisiana. All were thought to have an equal right upon the lake bed or bottom when its waters were down, as they had upon the lake itself when its waters were up. Accordingly, during the Civil War people came long distances to the lake, to utilize the water, rising in shallow wells dug in its bed, for salt making purposes, and the salt wells of Lake Bistineau became famous and were the chief source of the supply of salt for a large area of country.

So, too, the cattle of all living within convenient distance have had the indiscriminate range of the lake and were driven to its bed, when the waters were down, for pasturage purposes.

And hunters, far and near, resorted in numbers to the lake in the fall and winter months to enjoy the sport of shooting the innumerable wild fowl that congregate there.

About twelve or fifteen years ago a new kind of grass began to grow upon the lake bed immediately following the annual subsidence of its waters.

This grass grows to a height of two or more feet, and so thick that it chokes out and destroys the cocklebur and other weeds and grasses where it appears. It is an excellent forage grass, cattle graze and fatten upon it, and it was soon discovered that hay made from it was better than the best the market afforded.

The result was that the people of that section of country began going upon the bed of the lake at the season when the grass was in condition, and cutting and baling the hay, both for their own use and for market.

At the point where the land which plaintiff's titles call for borders the lake, the latter is nearly two miles wide and there this grass, so much in demand, seems to grow to the best advantage. Hence, it was and is a favorite locality of the grass cutters, and before plaintiff

acquired his holdings defendants and other persons were in the habit of cutting much hay there. Indeed, plaintiff seems to have been lured to that particular locality of the lake by the advantages mentioned, and his investment in the uplands, bordering the lake there, induced by the same. He believed that by acquiring the lands fronting on the lake, he would take as riparian proprietor to the centre of the lake bed, or to the low water channel. He seems to have been the first to assert a right of this kind.

Having purchased and taken possession, he announced his purpose to claim the right of ownership and of dominion to and over the lake bed in front of his holdings.

Defendants, Frazier and Noles, who lived near by and who had been cutting grass there for several years, were preparing to do so again in the summer following the purchase of plaintiff. They were on the ground with baling press, mowers, etc., had cleared away the bushes, erected a small cabin for shelter, and had cut some hay.

Plaintiff appeared, claimed the ground and the grass, forbade further cutting by defendants, caused one of them to be arrested for trespass, and then brought the present action to restrain them by writ of injunction from going upon that part of the lake bed, or cutting grass there.

In his petition he claims the ownership as riparian proprietor, by right of accretion or accession, of all the lake bed to the low water channel in front of his land situated on the hills bordering the lake, and his prayer is that he be decreed the owner thereof and the injunction be perpetuated.

Defendants deny that plaintiff has any right of ownership or possession in and to the lake lands in front of his tract bordering the lake. They allege the lake, its bottom or bed, to be public property; that the same has never been surveyed and is not subject to private ownership. They assert that neither in the past, nor since plaintiff purchased land on the lake front, has there been any alluvion or batture formed there, nor has any dereliction occurred by which any of the lake bottom has become uncovered, in the sense of the law, and attached to his holdings. They deny that he is the riparian owner of lands on the lake, and aver that his title calls for a "limited field" and so many acres fixed, the boundary thereof extending on the lake side no further than the natural bank of the lake at ordinary high water, ending at the meander line of the lake. They further contend that if

any part of the lake bed in front of plaintiff's land· is alluvion or reliction, the same had formed years ago, long prior to plaintiff's acquisition, and the same never passed to plaintiff because in no manner expressed or included in his deeds.   They reconvene for damages for his unlawful act in driving them from the land and restraining them by injunction, and represent that after service of the injunction upon them he (plaintiff) himself, cut the grass on the land where defendants had prepared to cut it, and marketed the same, or a portion thereof.

On these issues the case went to trial before·a jury whose verdict was favorable to defendants, but without any award as to damages against plaintiff.   The judgment of the court, based on this verdict, recites the rejection of plaintiff's demand, as well ·as that of defendants for damages.

Plaintiff appeals, and defendants ask amendment of the judgment by awarding them the sum they claim for damages.

The first inquiry arising is, do plaintiff's titles, by their terms,. embrace and include the land in the lake bed where defendants were cutting hay?

They do not.   There is no pretence that they do.

The next inquiry is, has there· been formed in front of his land bordering the lake, other land either by accretion or·dereliction, in the sense of the law, and·susceptible of ownership, and, if so, when did it form, and if formed prior to his purchase, did his vendors include the same in the sale to him?

If the lake bed in front of his land comes neither under the denomination of accretion nor dereliction, then it would seem that plaintiff has no right to fence defendants off such lake by either injunction, or rail or wire.

In the view we take of the case, it is not necessary to decide whether or not plaintiff has riparian rights as owner of the lands bordering the lake, nor whether or not the doctrine of "limited fields"—*in agris limitatis* of the Roman law—applies to. the titles by which he holds.

Neither is it necessary, or advisable, for us to inquire into the rights, if any; in and to the bed of the lake appertaining to the United States, or to the State of Louisiana—whether such bed does or does not attach to the public domain of the one or the other, whether or not the same is or is not susceptible of disposition under existing laws by the one or the other through their respective land depart-

ments, or whether or not Congress, in the one case, or the General Assembly, in the other, could, otherwise, dispose of same by legislative act.

If we view plaintiff as owner of lands on the lake to which riparian rights may attach, does he take the lake bed in dispute as alluvion or reliction?

From the definition of the word, alluvion is the land formed by sedimentary deposits and added to an ordinary tract by the imperceptible action of the waters bordering the latter. It is a mode of acquiring property by natural law, *jure gentium,* by those principles or maxims which regulated the conduct of men before the formation of civil society (6 M. 242), and is recognized by the statutory law as a means of the acquisition of property. C. C. 509.

Dereliction, or reliction, is land added to a front tract by the permanent uncovering of the waters; the laying bare of the bottom by the retirement of the waters, as contradistinguished from the building up of the bottom by deposits causing the waters to recede. Dereliction, as used by the English law, meant when the sea shrank back below the usual water mark and remained there. In those cases the law (English) is held to be that, if this be by little and little, it shall go to the owner of the land adjoining. 6 M. 244.

It is recognized (excluding the sea) by the Louisiana law as a mode of acquiring property. C. C. 510.

But the temporary subsidence of the waters, occasioned by the seasons, coming in the winter and staying through the spring, going in the summer and gone through the autumn, does not constitute dereliction, in the sense of an addition to the contiguous lands, susceptible of private ownership as riparian rights. There is no "increase of the land" in such case. The reliction must be from the waters in their usual state. Where it periodically rises up over the land and then recedes, there is no reliction. Bouvier, *verbo* "Reliction"; 12 La. 324; 34 Ann. 839.

The lake bottom, where defendants were preparing to cut grass, can not be said to be accretions, or alluvion, in the sense of the Code, for the testimony shows no alluvial or other deposit whatever has been made there for forty years, or as far back as any of the witnesses who testified in the case had knowledge of.

It can not be dereliction, for the same witnesses testify to no change in the bottom of the lake, and no change in the characteris-

Sapp vs. Frazier et als.

ties of the lake for forty years. There has been no dry land formed by "running water retiring imperceptibly from one of its shores and encroaching on the other." C. C. 510. There has been no change in the shores of the lake. Its banks do not and have not caved. Nothing has been taken from one shore and added to the other. There has been no permanent uncovering of the waters; no laying bare of the bottom by the retirement of the waters to stay; no shrinking back of the waters below the usual water mark and the remaining of the same at the point of shrinkage. It is true its bed, or large part of it, becomes measurably dry and remains so more or less for four or five months in the year. But it becomes covered again with water, which remains over it six or seven months, and in turn runs off leaving the bed exposed, and this successive recurrence of conditions has been going on without any change from time immemorial. There has been no decrease in the depth of the water (from six to ten feet) covering the hay field in dispute, except such as might result from a larger volume of water filling the lake one season and a less volume another season. But this is more or less an accidental fluctuation, depending on the rainfall of one season exceeding that of another, and the water in the Red River being higher one year than the next, or *vice versa*.

When plaintiff purchased his holdings on the lake, as well as since his purchase, exactly the same annual rise and fall of its waters was and has been going on, as was the case when his vendors acquired their titles, and during the years they held the land. Indeed, it is clear that the same conditions exist now as to this annual flow and ebb of the waters as existed *long prior* to the time plaintiff's vendors acquired title.

If there be land now in the bed of the lake in front of the plaintiff's holdings attachable thereto as accretions or as reliction, it existed in the same degree and condition during the time his vendors held the title, there having been no change. And if his vendors acquired as alluvion or dereliction the lake bed to which he now asserts right of ownership, they did not part with title to the same in their act of conveyance to him, for no mention whatever of its disposition to him is recited in such deeds either in express terms, or appears therefrom by implication.

For them to have intended to include it in their conveyances to him (supposing they then owned it), it was necessary such intention

should have been expressed in the deed. Barry vs. City, 22 La. Ann. 612; Livingston vs. Hoorman, 9 M. 658; 7 N. S. 624; 11 La. 142; 18 La. 229; 23 A. 551; 35 An. 209.

The original grant or patent of the land bordering on the lake, owned by plaintiff, came from the United States. But it is well settled that where the United States has made grants, without reservation or restriction, of public lands bounded on streams or other waters, the question whether the lands forming the beds of the waters belong to the State, or to the owners of riparian lands, is to be determined entirely by the law of the State in which the lands lie.

Hardin vs. Johnson, 140 U. S. 371; 137 U. S. 661; Lamprey vs. State (Minn.) 18 L. R. A. 670.

There has been no increase of land, whether by alluvion or dereliction, between the tract occupied by plaintiff and the lake, since the date of his purchase, and there was none before. Therefore, under the law of Louisiana, there has been nothing for him to take even giving him the benefit of the pretensions he asserts as riparian proprietor.

The modes or ways of the acquisition of property are limited to those prescribed by law. 34 La. Ann. 839.

He must be held to have had no greater right to the portion of the lake bed in dispute than defendants had, and no more right than they to cut grass there.

It follows that no sufficient cause for the injunction herein sued out existed, and that the same was properly dissolved.

We think the judgment appealed from should be amended by allowing defendants damages as attorneys fees for dissolving the injunction, and further amended by reserving to them the right to claim such further and additional actual damages, if any suffered, to which they may legally be entitled.

Defendants, however, had no right to the exclusive use of this hay field in the bottom of the lake which they occupied when plaintiff interfered. They had no right to post the same, nor fence the same, nor exclude others from it, nor deny to others the right to cut grass there. They had, of course, no property right in the grass there, and can claim nothing in the way of damages on that score.

We do not think it can be called trespassing on the public domain, whether of the State or the United States, for individuals to merely cut grass on the lake after the subsidence of the waters. But no one

can take such possession of the lake bed, or any part of it, for such purpose so as to exclude others from it. No priority of right to any particular spot or place in the lake bed is possessed by any one, and no such spot or place can be held by any one against the entry upon the same by others for grass cutting purposes.

The lake and lake bed are free to all to enter upon it, or any part of it, for any purpose not unlawful, and no one may claim any privilege there superior to others.

As the situation is, the lake bed is a public place open to the legitimate use of all alike.

For the reasons assigned, it is ordered, adjudged and decreed, that so much of the judgment of the court a qua as rejects plaintiff's demand, and dissolves his injunction, be and the same is hereby affirmed.

It is further ordered, etc., that so much of the said judgment, as rejects defendants' demand in reconvention, be avoided and reversed and it is now decreed that defendants, Frazier and Noles, do have and recover of the plaintiff the sum of one hundred and twenty-five dollars damages as attorney's fees for dissolving the injunction, and that on the remainder of their claim for damages there be judgment of dismissal as in case of non-suit, costs of both courts to be paid by plaintiff.

MR. JUSTICE MONROE takes no part, as he was not a member of the court when this case was heard.