**Eskridge E. SMITH, Jr.**

v.

**HUSTLER, INC., et al.**

Civ. A. No. 78–0368.

United States District Court,
W. D. Louisiana,
Shreveport Division.

May 26, 1981.

Charley Quienalty, Lake Charles, La., for plaintiff.

Richard H. Switzer, Lunn, Irion, Switzer, Johnson & Salley, Shreveport, La., for defendants Joseph R. Cook, Joseph R. Cook, Inc. and Home Ins. Co.

Paul Kram, Denver, Colo., for defendant Mountain Marine.

Alex F. Smith, Jr., Mayer, Smith & Roberts, Shreveport, La., for defendants Hustler, Inc., James M. Lee, Inc., d/b/a Hustler Boat Co.

## OPINION

STAGG, District Judge.

On September 5, 1977, a Labor Day celebration at Lake Bistineau ended in tragedy when Eskridge E. ("Sam") Smith Jr. was severely injured after being thrown out of the 16-foot pleasure boat in which he had been riding. The lower unit and propeller of the 85 horsepower motor seriously damaged Smith's left leg, arm, wrist, and hand.

Smith later filed this lawsuit, alleging that his injuries were caused by a defective "quick-disconnect" component in the steering assembly.[1] Essentially, he contends that the quick-disconnect device slipped off the steering assembly, resulting in a complete loss of steering. This caused the boat to veer sharply to the right, which in turn propelled Smith into the lake where he came into contact with the motor's propeller. In his petition, Smith claimed that this action falls within the admiralty jurisdiction of this court, pursuant to 28 U.S.C. § 1333(1).

Shortly before trial, on April 5, 1979, the parties submitted a joint pretrial order in which they stipulated that plaintiff's invocation of admiralty jurisdiction was appropriate. This case then proceeded to trial on Thursday, May 31, 1979.

On June 28, 1979, defendants filed a post-trial brief contesting jurisdiction. Despite their earlier stipulation that Lake Bistineau is a navigable waterway and that admiralty jurisdiction exists in this case, defendants contended for the first time that "there is no admiralty jurisdiction in Federal Court for recreational boating accidents on Lake Bistineau." Defendant's Post-trial Brief at 6. Defendants cited the cases of *Chapman v. United States*, 575 F.2d 147 (7th Cir. 1978) and *Adams v. Montana Power Co.*, 528 F.2d 437 (9th Cir. 1975), as authority for this contention.

This court's review of the *Adams* and *Chapman* decisions revealed a more serious problem with jurisdiction than that raised by defendants. The question is whether Lake Bistineau is navigable as that term is used in an admiralty context. Navigability is the first part of a two-part test for admiralty jurisdiction enunciated by the Supreme Court in *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1973). Though the actual holding in *Executive Jet* was very narrow,[2] many courts,[3] including the Fifth

---

1. A "quick-disconnect" mechanism is a connecting device between the steering line and the outboard motor. Its name is derived from the fact that it allows an operator quickly to disengage the steering line from the outboard motor, so that the motor may easily be removed from the boat. Obviously, when the quick-disconnect device is disengaged, there is a total loss of steering capacity in the boat. Plaintiff contends that the quick-disconnect device in this case, manufactured by Mountain Marine, Inc., is defective because its design allows it to slip off and become disengaged while the boat is in use, resulting in a loss of steering capacity.

2. Despite the apparent far-reaching effect of the *Executive Jet* decision, the Supreme Court expressed its narrow holding in that case as follows: "We hold that unless ... [a significant relationship to traditional maritime activity] exists, claims arising *from airplane accidents* are not cognizable in admiralty in the absence of legislation to the contrary." 409 U.S. at 268, 93 S.Ct. at 504 (emphasis added).

3. *See e. g. Kelly v. United States*, 531 F.2d 1144 (2d Cir. 1976); *St. Hilaire Moye v. Henderson*, 496 F.2d 973 (8th Cir. 1974), *cert. denied*, 419 U.S. 884, 95 S.Ct. 151, 42 L.Ed.2d 125 (1974); *Oppen v. Aetna Insurance Co.*, 485 F.2d 252 (9th Cir. 1973).

Circuit Court of Appeals,[4] have ruled that *Executive Jet* dispensed with the old "locality rule" of maritime jurisdiction in favor of a so-called "locality-plus rule".[5] Before *Executive Jet*, it was sufficient for a party invoking admiralty jurisdiction to show that an alleged tort took place on a navigable waterway. *Executive Jet* added a second requirement: a party invoking admiralty jurisdiction must also show that the alleged tort arose from activity which bears a significant relationship to traditional maritime activity.

■ In a recent case, the Fifth Circuit joined a host of other courts [6] by ruling that an accident involving pleasure craft was within the purview of admiralty jurisdiction. *Richardson v. Foremost Insurance Co.*, 641 F.2d 314 (5th Cir. 1981). *Richardson* destroys defendants' contention in their post-trial brief that recreational boating accidents may not be the subject of admiralty jurisdiction. Under *Richardson*, the second part of the *Executive Jet* test is probably met in this case even though plaintiff's accident involved a pleasure boat rather than a commercial vessel.[7] However, the question remains whether the alleged tort in this case occurred on a navigable waterway. If not, the first part of the *Executive Jet* "locality-plus" test is not satisfied, and this court must dismiss for lack of subject matter jurisdiction. To determine whether Lake Bistineau is a navigable waterway, this court must first consider the factual circumstances regarding Lake Bistineau, and must then consider those facts in light of the jurisprudence concerning navigability.

## I. LAKE BISTINEAU

■ In the pretrial order, the parties stipulated several pertinent facts concerning Lake Bistineau. Quoting from an old decision of the Louisiana Supreme Court, the parties agree that Lake Bistineau was navigable in fact in 1899:

Lake Bistineau is a body of water situated in northwestern Louisiana, forming the boundary line between the parish of Bienville on the east and the parish of Bossier on the west, and extending up into the parish of Webster. The lake is 30 or 40 miles long, from 1 to 2 miles wide. At its northern extremity Bayou Dorcheat flows into it, and through Loggy Bayou, at its southern extremity, the lake drains into Red river. The three (Loggy Bayou, Lake Bistineau, and Bayou Dorcheat) constitute a navigable waterway of the United States, to improve which Congress has repeatedly made appropriations of money, and through which steamboats approach within a few miles of the town of Minden, the county seat of Webster parish. Navigation through the lake for steamboats begins in January or February, and ex-

---

**4.** *Kelly v. Smith*, 485 F.2d 520 (5th Cir. 1973). The Fifth Circuit recently observed as follows:

[I]t is now well established in this Circuit, on the strength of *Executive Jet*, that for admiralty jurisdiction to lie over a general maritime tort action not only must the locality test be met but also the injury complained of must bear a significant relationship to maritime activity. *Moser v. Texas Trailer Corp.*, 623 F.2d 1006, 1009 (5th Cir. 1980); *Sperry Rand Corp. v. Radio Corp. of America*, 618 F.2d 319, 321 (5th Cir. 1980).

*Sohyde Drill & Marine Co. v. Coastal States Gas Prod.*, 644 F.2d 1132, 1135, (5th Cir. 1981).

**5.** For an excellent discussion of the history of the "locality rule" and the development of the "locality-plus rule", *see* Calamari, *The Wake of Executive Jet—A Major Wave or a Minor Ripple*, IV The Maritime Lawyer 52 (1979).

**6.** *See e. g. Kelly v. United States*, 531 F.2d 1144 (2d Cir. 1976); *Richards v. Blake Builders Supply, Inc.*, 528 F.2d 745 (4th Cir. 1975); *St. Hilaire Moye v. Henderson*, 496 F.2d 973 (8th Cir. 1974), *cert. denied*, 419 U.S. 884, 95 S.Ct. 151, 42 L.Ed.2d 125 (1974); *Armour v. Gradler*, 448 F.Supp. 741 (W.D.Pa.1978). Other courts have expressed a contrary view. *See e. g. Marroni v. Matey*, 492 F.Supp. 340 (E.D.Pa. 1980).

**7.** It is arguable that *Richardson* is distinguishable from this case. *Richardson* concerned a collision between two pleasure boats. It is clear that a collision between pleasure boats on navigable water presents a much more significant threat to commercial activity than does an accident involving a single craft in which a single passenger is injured. *See generally* Calamari, *supra* n. 5, IV The Maritime Lawyer at 75–78.

tends, through the spring months, into the early summer.

*Sapp v. Frazier*, 51 La.Ann. 1718, 1719, 26 So. 378, 379 (La.1899). As noted in the pretrial order, several subsequent decisions of Louisiana state courts recognized that Lake Bistineau was navigable at the time Louisiana entered the Union. *See e. g. Bedingfield v. Watson*, 147 So.2d 458 (La. App.2d Cir. 1963).

The parties also agree that Lake Bistineau has been dammed.[8] At the time of the filing of the pretrial order the parties did not believe that the dam prevents the lake from being classified as a navigable waterway. In plaintiff's post-trial brief, filed July 19, 1979, plaintiff does not deny the following allegation made by defendants in their post-trial brief:

Since the dam was built to create Lake Bistineau from Bayou Dauchite [sic] over forty years ago, the only boating activities conducted have been for recreation and noncommercial fishing.

Defendants' Post-trial Brief at 6.

■ This court deems it appropriate to take judicial notice of certain facts regarding Lake Bistineau's present state, pursuant to Rule 201 of the Federal Rules of Evidence. Rule 201 allows the court to take judicial notice of "adjudicative facts" that are "not subject to reasonable dispute" in that they are "generally known within the territorial jurisdiction of the trial court." [9] The originator of the terminology "adjudicative facts" as used in Rule 201 has expressed the following definition of that terminology:

Adjudicative facts are those to which the law is applied in the process of adjudication. They are the facts that normally go to a jury in a jury case. They relate to the parties, their activities, their properties, their business.

Davis, *Judicial Notice*, 55 Colum.L.Rev. 945, 952 (1955). In this case, the facts surrounding Lake Bistineau are "adjudicative facts" because the jurisprudence concerning navigability must be applied to them in order to determine whether Lake Bistineau is a navigable waterway. In addition, there is no question that the recreational nature of Lake Bistineau is "generally known" within this community. It is common knowledge that since the dam was constructed at Lake Bistineau the lake has not been susceptible

---

**8.** In 1930, the Louisiana Legislature established the Lake Bistineau State Game and Fish Preserve. Acts 1930, No. 43; *see also* Acts 1942, No. 64; Acts 1969, No. 152; and Acts 1977, No. 222 § 1. At that time, the Game and Fish Preserve was under the administration of the Department of Conservation.

Under the authority created by Section 12 of Act 43 of 1930, the Conservation Commission constructed a "substantial earth dam across the old channel of Loggy Bayou" in late 1934 and early 1935. *Evans v. Dugan*, 205 La. 398, 17 So.2d 562, 565 (La.1944). Additional work repairing and improving the dam was completed in November of 1941. "The earth dam, with a concrete spillway, is one and one-half miles long and twenty feet high. The lake formed by the impounded waters is about thirty miles in length and its width varies from a few hundred feet to three miles." *Id.*

The Lake Bistineau State Game and Fish Preserve is now under the administration of the Department of Wildlife and Fisheries. La.R.S. 56:801 (Supp.1977).

**9.** In *Fox v. City of West Palm Beach*, 383 F.2d 189, 194–95 (5th Cir. 1967), the Fifth Circuit discussed the judicial notice rule as follows:

The court may, of course, take judicial notice of facts which need not be proved. The most frequent application of the judicial notice doctrine is common knowledge. The rule has been thus declared:

"Judicial notice in any particular case is not determined or limited by the actual knowledge of the individual judge or court. This means that it is not essential that matters of judicial cognizance be actually known to the judge; if they are proper subjects of judicial notice, the judge may inform himself in any way which may seem best to his discretion, and act accordingly. On the other hand, facts which are not judicially cognizable must be proved, even though known to the judge or to the court as an individual. In other words, the individual and extrajudicial knowledge on the part of a judge will not dispense with proof of facts not judicially cognizable, and cannot be resorted to for the purpose of supplementing the record." 29 Am.Jur.2d 55, Evidence § 15.

As an example of a fact which is appropriate for judicial notice since it is a matter of general knowledge, the court in *Fox* approved the trial judge's notice that "where cypress grows, pine doesn't grow." *Id.* n. 2.

of use for commercial shipping and, in fact, has been used exclusively for recreational activities. One simply would not expect to see, and would not see, tugboats, barges, or any other type of commercial vessel on Lake Bistineau.

Furthermore, there is no reasonable likelihood that Lake Bistineau will become or be made navigable in the near future. An entire recreation industry now surrounds the lake. The property values for lakefront property would be seriously affected by any attempt to open the waters of Lake Bistineau to commercial traffic. Even if the dam were to be destroyed by some natural disaster, it would unquestionably be rebuilt, and recreational activities would continue as before.

Thus, based upon the parties' stipulations in the pretrial order and the aforementioned judicial notice,[10] this court finds the following facts concerning Lake Bistineau's current situation:

(1) Lake Bistineau was formerly a navigable waterway;

(2) The lake's navigability was altered when the dam was constructed over 40 years ago;

(3) Since the dam was built, the lake has been used exclusively for recreational, non-commercial activity, and is not usable for commercial shipping; and

(4) There is no reasonable likelihood that the lake will be rendered susceptible of use for commercial shipping in the foreseeable future.

## II. THE JURISPRUDENCE CONCERNING NAVIGABILITY

Neither in the pretrial order nor in plaintiff's post-trial brief does plaintiff dispute

that Lake Bistineau, in its present state, is not used and is not susceptible of use for commercial shipping. Nevertheless, plaintiff relies on the cases of *Economy Light & Power Co. v. United States*, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921), and *Madole v. Johnson*, 241 F.Supp. 379 (W.D.La.1965) (Dawkins, J.), for the proposition that "once a waterway is found to be navigable it remains navigable as a matter of admiralty law." However, a careful reading of the *Economy Light* case reveals that this proposition simply is not stated in that case. In addition, Judge Dawkins' decision in *Madole* is clearly erroneous in light of a recent Supreme Court decision, *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

In *Madole*, Judge Dawkins relied on several Supreme Court decisions in ruling that Arkansas's Lake Hamilton, which was once a navigable waterway, remained navigable for purposes of admiralty jurisdiction despite the fact that its damming ended all commercial activity on the lake. However, the Supreme Court opinions relied on by Judge Dawkins, with few exceptions, were not admiralty decisions, but involved the scope of Congress' regulatory authority under the Interstate Commerce Clause. The Supreme Court's discussion of navigability in *Kaiser Aetna* demonstrates the error in this analysis:

"[A]ny reliance upon judicial precedent must be predicated upon careful appraisal of the *purpose* for which the concept of 'navigability' was invoked in a particular case." ... [I]t must be recognized that the concept of navigability in these decisions was used for purposes other than to delimit the boundaries of the navigational servitude: for example, to define the

---

**10.** Subpart (e) of Rule 201 provides that a party is entitled "to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed." If plaintiff believes that the facts noticed by this court are not properly the subject of judicial notice he shall have ten (10) days from this date in which to make such objections known.

However, the court emphasizes that at no point in this litigation has plaintiff denied that Lake

Bistineau is presently used only for recreational activities. Nor has plaintiff denied that the dam rendered the lake insusceptible of being used for commercial shipping. Rather, as will be discussed in Part II of this decision, *infra*, plaintiff contends that the damming of a formerly navigable waterway does not render that waterway non-navigable for purposes of admiralty jurisdiction.

scope of Congress' regulatory authority under the Interstate Commerce Clause, to determine the extent of the authority of the Corps of Engineers under the Rivers and Harbors Act of 1899, and to establish the limits of the jurisdiction of federal courts, conferred by Art. III, § 2, of the United States Constitution, over admiralty and maritime cases.

100 S.Ct. at 388 (citations omitted, emphasis in original). In a footnote, the Supreme Court recognized that " 'Navigable water' subject to federal admiralty jurisdiction was defined as including waters that are *navigable in fact* in *The Propeller Genesee Chief v. Fitzhugh*, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851)." *Id.* n. 7 (emphasis added).[11]

Thus, the Supreme Court recognized in *Kaiser Aetna* that the test of navigability set out in Commerce Clause decisions is not controlling in admiralty cases. The Eighth Circuit Court of Appeals recently discussed this distinction in *Livingston v. United States*, 627 F.2d 165, 169–70 (8th Cir. 1980):

In *Kaiser Aetna*, the Court noted specifically that Congress' regulatory authority under the Commerce Clause is historically very broad and the expansive definitions of navigability developed in Commerce Clause cases are not really appropriate in other contexts where the actual capability of a stream to support navigation is critical. What is required in those contexts is a functional analysis of "navigability" so that the limits of governmental authority are determined in accordance with the purposes it serves. . . .

Federal admiralty jurisdiction has its genesis in the felt need to provide a uniform body of law governing navigation and commercial maritime activity. Admiralty law, as a consequence, is concerned almost exclusively with the special needs of the shipping industry. Exten-sions of admiralty jurisdiction have followed the opening of new waters to commercial shipping. In our view, *the closing of waters to commercial shipping should likewise have the effect of eliminating admiralty jurisdiction over them. In other words, the concept of "navigability" in admiralty is properly limited to describing a present capability of waters to sustain commercial shipping.*

In *Livingston*, the Eighth Circuit relied upon the decisions in *Chapman v. United States, supra,* and *Adams v. Montana Power Co., supra,* in finding that pleasure craft accidents on waters where all commercial activity has ceased due to construction of a dam do not give rise to admiralty jurisdiction. This court agrees with the rationale employed in the *Livingston, Chapman* and *Adams* decisions, and finds those cases virtually indistinguishable from the instant case. Inasmuch as all commercial activity on Lake Bistineau ceased after the construction of the dam, and the lake in its present state is not susceptible of use for commercial shipping, the court finds that Lake Bistineau is not a navigable waterway within the contemplation of admiralty jurisdiction. Accordingly, the first requirement of the *Executive Jet* test of jurisdiction is not satisfied, and this court must dismiss this case for lack of subject matter jurisdiction.

## III. CONCLUSION

■ The court is aware of the significant hardship which this ruling may cause plaintiff. The record does not reflect whether plaintiff's counsel filed a similar action in a Louisiana state court. If not, by this court's ruling, plaintiff is effectively left without a remedy because his action has prescribed under Louisiana law. La.R.S. 9:5801 provides that actions which are filed in courts of proper jurisdiction interrupt the running of prescription. The converse is that actions such as this one which are filed

---

**11.** This court has found that there is no reasonable likelihood that Lake Bistineau will be rendered susceptible of use for commercial shipping in the near future. Under the "navigable in fact" test, this finding is, technically speaking, superfluous; the pertinent fact is that Lake Bistineau is not *presently* susceptible of use for commercial shipping. However, in *Chapman v. United States, supra,* the court cited the fact that the waterway in that case would likely be used only for recreational activities as yet another reason why admiralty jurisdiction was inappropriate. This court agrees with this reasoning.

in courts of improper jurisdiction do not interrupt the running of prescription. As noted previously, the accident upon which this lawsuit is based took place on September 5, 1977. Louisiana's one-year prescriptive period for tort actions has run. Under § 5801, the fact that plaintiff filed this suit on March 29, 1978, within the one-year period, is of no aid since this court is one of improper jurisdiction.

■ Despite the apparent inequity in this decision,[12] there is no more fundamental a principle regarding our federal court system than that federal courts are courts of limited jurisdiction. Subject matter jur-

12. The inequities involved in dismissing plaintiff's claims for lack of subject matter jurisdiction are exacerbated by this court's belief that the trial testimony of plaintiff's expert witness established the defectiveness of the quick-disconnect mechanism. The court accepted plaintiff's expert, Robert William Hobbs, as an expert in small craft design. Hobbs attended the Carnegie Institute of Technology for four years, receiving a degree in mechanical engineering. He then spent 16 months in the United States Navy mechanical training school and later attended special courses at the University of Miami and the University of Michigan. His special courses at the University of Michigan included a course on small craft design.

Later, Hobbs was an instructor at the University of Miami in small craft design and a member of the Board of Advisors of the Winnislos School of Yacht Design. In 1964, Hobbs wrote a technical paper for the Society of Small Craft Designers entitled "Faster Boats", and has written a "great number of articles" for what is now *Boating Magazine.* Hobbs also wrote a book for Jones and Laughlin Steel Corporation concerning propeller shaft selection for small craft.

In addition to his writing, Hobbs holds two patents on gear box designs and a patent on a wood screw head design. At the time of trial, he had a patent pending on a boat hull shape. Included among his awards are an honorable mention by the National Gold Cup Safety Awards. He holds a 100-ton passenger boat license from the United States Coast Guard, and has been listed in Who's Who in Engineering and in Engineers of Distinction.

Most notably, during World War II, Hobbs and three to five associates handled the production and design of the first PT Boats, and originated and designed all of the high-speed crash boats used by the United Nations. After the War, Hobbs started his own research and design company, and designed boats for the Century Boat Company and for the American Hydroplane Corporation, among others.

Based upon these stellar credentials, this court gives much weight to Hobbs' expert opinion that the Mountain Marine quick-disconnect mechanism is defectively designed. Hobbs' expert opinion was based, in part, upon the following information contained in the record: his review of the complaint in this case; the two Mountain Marine brochures; the photographs of the motor and the connector and the photographs of the motor with its new connector; the pretrial order; and all statements and depositions given in relation to this case. Hobbs also personally inspected the quick-disconnect mechanism identified as Exhibit P–8, the new connector, and the boat. He viewed the quick-disconnect mechanism as it was attached to the motor. Finally, he was present in the courtroom during the trial and heard all of the testimony given before he took the stand.

Based upon this information, Hobbs expressed his expert opinion that "[Exhibit] P–8, in its configuration, is unsuitable as a part of the steering system." Hobbs believed that the quick-disconnect mechanism has one basic fault:

The spring system whose function it is to maintain the sleeve around the small part of the ball post . . . did not have proper shouldering at the end. The sleeve itself is too small from an outside diameter to manage the needed thrust on this spring, and the snap ring at the threaded end is just totally insufficient and inadequate to support the axial force from the spring. In operation, with the vibration and with the steady axial load from the spring, it would take every opportunity to unthread itself over one or both of these members, that is, the sleeve or the snap ring. The installation required that the ball post be verticle with the ball downward, and the weight of gravity tends to make the socket part drop off.

In regard to the spring itself, it is Hobbs' opinion that the spring "seems quite a bit weaker than it needs to be." Hobbs observed that often the outer coils of springs are made permanent, "which prevents it from expanding and going over shoulders" as did the spring in this case. In Hobbs' opinion, if washers had been installed between the sleeve and the spring, and between the spring and the threaded-end snap ring, then even when the spring changes diameter as it is compressed, it could have stayed in place.

Hobbs offered several "minor design observations", *i. e.,* suggestions on how to improve the design of the mechanism. First, Hobbs would put a hole in the bottom so that water could pass through without remaining in the sleeve and developing problems. Second, Hobbs noted that the sleeve itself could have been enlarged on the smaller end so that the weight of the system would have tended to hold the sleeve in place. Hobbs suggested other design modifications regarding the design of the ball.

isdiction may not be waived, and may not be conferred by the consent of the parties. If a federal district court finds that it is without subject matter jurisdiction in a case, it has no choice but to dismiss regard-less of any equitable considerations. *Petti-nelli v. Danzig*, 644 F.2d 1160, 1161, (5th Cir. 1981);[13] *see also Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 375, 98 S.Ct. 2396, 2403, 57 L.Ed.2d 274 (1978).

The "ball" is not wholly spherical, but is de-signed to include a portion of a sphere, a por-tion of a cone, and a portion of a cylinder. Hobbs expressed his opinion that if the ball was wholly spherical, the conical portion which tends to make the sleeve back off, even against partial spring pressure, would not be present. Hobbs emphasized throughout the course of his testimony that he has no basic objection to spring-loaded systems. It is simply his opinion that the poor design of this *particular* mecha-nism is the sort of inadequate design that has given quick-disconnect devices a bad reputa-tion.

Defendants also presented expert testimony. Stanley J. Sedivy Jr. was tendered to and ac-cepted by the court as an expert in mechanical engineering and accident reconstruction. Sedi-vy testified that the tests he performed on a Mountain Marine quick-disconnect mechanism established to his satisfaction that the device was not defective in any sense. Sedivy's first test on the mechanism was to determine the natural frequency of the spring system. He testified that engineers refer to this type of system as a "spring mass system", which is one of the most common naturally-occurring systems and is the basis for most dynamic analyses, or shock or vibration analyses. Sedi-vy determined that the natural frequency of the Mountain Marine spring mass system was somewhere between 118 cycles per second and 247 cycles per second. That is, the spring system is responsive in this range. Next, Sedi-vy determined the half period of that particular frequency. The half period is used in impulse analysis or shock analysis. Sedivy found that this systems half period ranged from 4.3 to 2.3 milliseconds. Once Sedivy had determined the natural frequency and the half period, he was in a position to apply input to the device to see how it would respond. In this case, Sedivy determined that the only practical results would be obtained from applying this input to the shaft upon which the quick-disconnect sys-tem is mounted. Sedivy used several charts prepared by the Boeing Aircraft Company in performing what he termed a "shock spectra analysis".

Sedivy testified that the purposes of these tests were to determine what acceleration must be applied to the shaft over what period of time in order to move the sleeve and disengage the mechanism. The results of these tests would then reveal what real world influences could operate to move the sleeve and to disengage the quick-disconnect mechanism. After per-forming these tests, it was Sedivy's opinion that it would take a great deal of force applied over a very short period of time to disengage the system. However, he felt that if such force had been applied to the system in this case, it would have caused extensive damage to the engine. In addition, Sedivy believed that the same amount of input applied to the hull of the boat would have caused severe damage to the hull.

Sedivy also performed a test, which he called the "standard drop shot" test to find out whether, under certain impact conditions, the spring would climb up over the snap ring. He performed this test six to eight times, but on no occasion did the spring go over the edges of the snap ring. Sedivy also performed tests on the steering system and on the hull of the boat to ascertain what forces to either of those parts of the boat might cause the disengagement of the quick-disconnect mechanism. He found that any force sufficient to cause disengagement would also have caused severe structural dam-age either to the boat or to the steering system. The court discounts Sedivy's expert testimony to a great extent, based upon the fact that his tests were largely restricted to a *new* quick-dis-connect fixture. Sedivy testified that the tests which he performed on a used Mountain Ma-rine fixture were restricted to determining the spring constant for that fixture. Thus, while Sedivy's tests offer proof that *new* Mountain Marine quick-disconnect fixtures may well be safe, the tests do not effectively rebut Hobbs' persuasive expert testimony.

The court in this case faced a situation which it often faces: conflicting testimony by two ex-pert witnesses. Hobbs' opinion seemed more reasonable and more persuasive. If this court were not forced to dismiss this matter for lack of subject matter jurisdiction, it would be in-clined to accept his opinion that the Mountain Marine quick-disconnect mechanism is, indeed, defective.

13. In *Pettinelli*, the Fifth Circuit noted as fol-lows:

A federal court's inquiry into its own juris-diction to consider the merits of a case before it has been aptly characterized by commenta-tors as "the first principle of federal jurisdic-tion." P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 835 (2d ed. 1973). So critical is this "first principle" to our constitutional government that federal jurisdiction is said to be an "open" question at all stages ... of an action. In fact, "[t]his

For the foregoing reasons, this matter is DISMISSED in its entirety for lack of subject matter jurisdiction.

question the court is bound to ask and answer for itself, even when not otherwise suggested...," *Mansfield Coldwater & Lake*

*Michigan Ry. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884) .... At 1161.